## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

**CAREY DALE GRAYSON,**

      **Plaintiff,**

   **v.**                           **CASE NO.**

**JOHN Q. HAMM, Commissioner,**      **CAPITAL CASE**
**Alabama Department of Corrections,**    **Execution Date Requested**

**TERRY RAYBON, Warden,**
**Holman Correctional Facility,**

**ALABAMA DEPARTMENT**
**OF CORRECTIONS, an**
**Administrative Department of the**
**State of Alabama,**

**STEVEN MARSHALL, Attorney**
**General, State of Alabama, and**

**KAY IVEY, Governor, State of**
**Alabama.**

      **Defendants.**

_____

## COMPLAINT
_____

1. Carey Dale Grayson ("Plaintiff") is in the custody of Defendant Alabama

Department of Corrections ("ADOC"), Defendant Hamm, and Defendant Raybon, at

William C. Holman Correctional Facility ("Holman") under a sentence of death imposed by the State of Alabama.[1]

2. Plaintiff brings this action, pursuant to 42 U.S.C. § 1983 alleging Defendants have deprived, or will deprive, him of rights and privileges secured by the Constitution and laws of the United States.

## JURISDICTION AND VENUE

3. This is an action for declaratory and injunctive relief.

4. This Court has jurisdiction pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343(a)(3), 2201, 2202, and 42 U.S.C. § 12133.

5. Venue is appropriate in the Middle District of Alabama under 28 U.S.C. § 1391(b).

## PARTIES

6. Carey Dale Grayson, a citizen of the United States and resident of Alabama, is subject to execution by the State of Alabama pursuant to a state court judgment of conviction for capital murder.

7. John Q. Hamm, in his official capacity, is the Commissioner of the ADOC.

8. Terry Raybon, in his official capacity, is the Warden of Holman and Petitioner's statutory executioner.

---

[1] On June 10, 2024, Defendant Marshall moved the Alabama Supreme Court to issue a warrant authorizing Defendant Ivey to set an execution date for Mr. Grayson. The Alabama Supreme Court extended the time for Mr. Grayson to file his response to Defendant's motion to July 17, 2024.

9. ADOC is the administrative department of the State of Alabama responsible for administering and exercising the direct and effective control over penal and corrections institutions throughout the state of Alabama, including performing executions.

10. ADOC is an agency of the State of Alabama.

11. Steven Marshall, in his official capacity, is the Attorney General of the State of Alabama ("Attorney General").

12. Defendant Marshall is responsible for starting the process for setting an execution date by filing a motion with the Alabama Supreme Court.

13. Defendant Marshall designates the method of execution in those motions.

14. Kay Ivey, in her official capacity, is the Governor of the State of Alabama.

15. The Alabama Supreme Court has delegated its authority to set the time for executions to Defendant Ivey.

## CASE OR CONTROVERSY

16. There is a real and justiciable case or controversy between the parties.[2]

## ADMINISTRATIVE EXHAUSTION

17. Plaintiff has no available administrative remedies, as "[t]he policies and procedures of the Department of Corrections for execution of persons sentenced to

---

[2] This case does not challenge Mr. Grayson's conviction and sentence.

death shall be exempt from the Alabama Administrative Procedure Act, Chapter 22 of Title 41." Ala. Code § 15-18-82.1(g).[3]

## FACTUAL ALLEGATIONS

18.  Defendant Marshall and Attorney General staff wrote the nitrogen execution protocol.

19. The nitrogen execution protocol calls for the use of a mask to deliver 99.999% pure nitrogen gas.

20.  Defendant Hamm approved the nitrogen execution protocol.

21.  Defendant Ivey selects the date for the execution.

22.  Defendant Raybon implements the nitrogen execution protocol.

23. Defendant Raybon oversees the execution team.

24.  Defendant Marshall selected Kenneth Eugene Smith ("Mr. Smith") to be the first person in history to be executed by nitrogen hypoxia.

25. On January 25, 2024, Mr. Smith died after being subjected to Defendant Marshall's nitrogen execution protocol, administered by Defendants ADOC, Hamm, and Raybon, at the direction of Defendant Ivey.

---

[3] *See also In re Alabama Lethal Injection Protocol*, 12-cv-00316-WKW (M.D. Ala. 2012), Doc. 354 at 5 (admitting "[n]o administrative grievance process is available for Plaintiffs or other death row inmates to challenge the procedures to be employed during their executions.").

26. Prior to Mr. Smith's death, Defendants Hamm, Raybon, Marshall, and ADOC represented to this Court that Alabama's nitrogen protocol would "cause unconsciousness within seconds" of nitrogen flowing into the mask.[4]

27. Defendants Hamm, Raybon, Marshall and ADOC knew, or should have known, that increased levels of oxygen in their nitrogen execution system would cause the execution to last significantly longer than "seconds."

28. Defendants Hamm, Raybon, Marshall, and ADOC did not follow the manufacturer's instructions and "fit" the mask specifically to Mr. Smith or test the fit of the mask.

29. Many witnesses were present for Mr. Smith's execution, including Mike Sennett ("Mr. Sennett"), one of victim Elizabeth Sennett's sons.

30. Mr. Sennett witnessed the 2010 lethal injection execution of Mr. Smith's co-defendant, John Parker, and the 2023 failed attempt to execute Mr. Smith by lethal injection.

31. Mr. Parker was executed with a three-drug protocol that began with a five-gram dose of sodium thiopental, followed by a paralytic and then potassium chloride.

---

[4] Defs.' Post-Hr'g Br. in Opp'n to Pl. Smith's Mot. for Prelim. Inj., *Smith v. Hamm, et al.*, No. 2:23-cv-656-RAH (M.D. Ala. Dec. 29, 2023), Doc. 66 at 12.

32. Mr. Sennett described Mr. Parker's execution as being "like him going to sleep."[5]

33. "[A] person designated by the [ADOC] to participate in an execution in any capacity shall be exempt from criminal liability for necessary actions taken to carry out the execution."[6]

34. "[A] person authorized by state law to prepare, compound, or dispense medication and designated by the [ADOC] may prepare, compound, or dispense a lethal injection."[7]

35. Defendants ADOC and Hamm obtain midazolam for use in lethal injection executions from "a person authorized by state law to prepare, compound, or dispense medication."

36. Other witnesses to Mr. Smith's nitrogen execution included Mr. Smith's wife, Deanna Smith, his son, Steven Tiggleman, his longtime attorney Robert Grass, and independent journalist Lee Hedgepeth of Tread.

37. Five statutory[8] media witnesses were present: (1) Kim Chandler of the Associated Press; (2) Ralph Chapoco of the Alabama Reflector; (3) Ivana Hrynkiw of

---

[5] Nicholas Bogel-Burroughs, "A Select Few Witnessed Alabama's Nitrogen Execution. This Is What They Saw," N.Y. Times (Feb. 1, 2024), https://www.nytimes.com/2024/02/01/us/alabama-nitrogen-execution-kenneth-smith-witnesses.html.

[6] Ala. Code § 15-18.82.1(f).

[7] *Id.*

[8] *See* Ala. Code § 15-18-83(a)(6); ADOC Execution Procedures XI(A)(vii)(2) (Aug. 2023) ("News media representatives who were unable to witness the execution will be provided an opportunity to

AL.com; (4) Lauren Layton of News 19 (WHNT); and (5) Marty Roney of the Montgomery Advertiser.

38. Mr. Smith's spiritual advisor was in the execution chamber with Mr. Smith before, during, and after the execution.

39. Mr. Smith remained conscious for several minutes after the nitrogen began flowing into his mask.

40. After the nitrogen began flowing and while he was still conscious, Mr. Smith writhed and struggled against the restraints for several minutes.

41. After the nitrogen began flowing, Mr. Smith gasped for air for several minutes.

42. Mr. Smith's responses after the nitrogen began flowing showed the signs of conscious suffocation.

43. At Defendant ADOC's post-execution press conference, Mr. Sennett said Mr. Smith looked like "a fish out of water for some time[.]"

44. Mr. Sennett explained, "We were told by some people that worked [in the prison system] that he'd take two or three breaths and he'd be out and gone. That ain't what happened. After about two or three breaths, that's when the struggling started."[9]

---

ask questions of the news media representatives who attended the judicial execution as statutory witnesses.").

[9] Bogel-Burroughs, "A Select Few," *supra*.

45.  After he described "all that struggling and jerking and trying to get off that table," Mr. Sennett said a nitrogen hypoxia execution is "just something I don't ever want to see again."[10]

46. Midazolam is a controlled substance.

47. The person who provides midazolam to Defendant ADOC is a pharmacist or pharmacy.

48. Ketamine, a short-term anesthetic, is a controlled substance.

49. Ketamine is readily available in pharmacies throughout Alabama.

50. Fentanyl is a controlled substance that acts as an analgesic and sedative.

51. The estimated lethal dose of fentanyl is 2 mg.

52. Fentanyl is readily available in pharmacies throughout Alabama.

53. Fentanyl is no longer subject to patent.

54. Ketamine is no longer subject to patent.

55. A pharmacist has the training and skill to synthesize or compound ketamine from readily available, non-controlled materials.

56. A pharmacist has the training and skill to synthesize or compound fentanyl from readily available, non-controlled materials.

---

[10] *Id.*

8

57. The mask used in the nitrogen execution protocol is designed and intended to help workers breathe in oxygen-deficient environments or environments containing harmful gases or substances.

58. The mask is neither designed for, nor intended to, deliver nitrogen gas for purposes of causing death.

59. The manufacturer of the mask requires that the mask be fitted and tested on the person using the mask prior to use.

60. Only Defendant Hamm has the authority to alter, amend, or make exceptions to the protocol and procedures governing the execution of death-sentenced inmates in the State of Alabama.

61. Defendant Hamm is responsible for implementing the nitrogen execution protocol.

62. Defendant Hamm serves at the pleasure of Defendant Ivey.

63. Only Defendant Ivey has the authority to set a timeframe for execution.

64. Only Defendant Ivey has the authority to grant a reprieve.

65. Defendant Marshall, in his sole discretion, selects whom to request permission to execute.

66. Defendant Raybon, as statutory executioner, is responsible for ensuring the nitrogen protocol is carried out in the manner intended.

67. At the time of the opt-in, binding Eleventh Circuit precedent prohibited Mr. Grayson from challenging lethal injection with any method other than one provided for by statute.[11]

68. At the time of the opt-in, anyone who wished to challenge execution by lethal injection had one option: elect nitrogen hypoxia.

69. Defendants' nitrogen execution protocol[12] was provided, though only in a heavily redacted form, to Plaintiff's counsel on August 25, 2023.

70. Defendants used this protocol to execute Kenny Smith with nitrogen gas on January 25, 2024.

71. Plaintiff Carey Dale Grayson selected execution by nitrogen gas in June 2018, over five years before the protocol was developed and made public.

72. There is a substantial likelihood that the nitrogen execution protocol, as employed in the "textbook" execution of Kenneth Smith, will cause Mr. Grayson to be deprived of oxygen while he remains conscious until he dies, and to experience suffocation.[13]

---

[11] *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1317 (11th Cir. 2016) (holding, generally, that an alternative method must be statutorily authorized), *abrogation recognized by Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201, 1207 (11th Cir. 2020).

[12] All references to the nitrogen execution protocol refer to the redacted protocol made public in August 2023.

[13] *Suffocation,* Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/suffocation (last visited June 20, 2024).

73. Depriving a conscious person of oxygen creates a "constitutionally unacceptable risk of suffocation." *Baze v. Rees*, 553 U.S. 35, 53 (2008).

74. Because Defendants' nitrogen execution protocol does not have sufficient safeguards to prevent conscious suffocation from happening, it violates the Eighth Amendment.

75. To satisfy the pleading requirement of *Glossip v. Gross*, 576 U.S. 863 (2015), Mr. Grayson must provide options that are feasible and reduce the risk of an Eighth Amendment violation.

76. Those options must be "sufficiently detailed" to show that the option is feasible and "readily implemented."[14]

77. Mr. Grayson offers two readily available and feasible alternatives to Defendants' present nitrogen execution protocol. First, Mr. Grayson offers an alternative nitrogen execution protocol. As a second alternative, Mr. Grayson proposes a sequential, intramuscular injection of ketamine and a fatal dose of fentanyl.

**Method one: Alternative nitrogen gas protocol.[15]**

78. Once a prisoner has been given an execution date, a physical should be conducted to determine if they have any upper airway obstruction issues.

---

[14] Mr. Grayson objects to the requirement that he must provide the state with a constitutional method to execute him. That said, he recognizes that providing such methods is required for him to maintain this action and does so without prejudice to his objection.

[15] All steps in this proposal will be done with the curtains open to the execution chamber so all witnesses can observe.

79. The prisoner shall be placed on a table and wheeled into the execution chamber, where a transparent, monoplace hyperbaric chamber will be ready.

80. After being wheeled into the chamber, the prisoner shall be allowed to be ministered by his spiritual advisor as previously approved.

81. He shall then be allowed to make a final statement.

82. The prisoner will be given an intramuscular injection of ketamine in a 10 mg dose.

83. EKG leads will be placed upon the prisoner. The EKG will be monitored throughout the process.

84. While these events are occurring, the hyperbaric chamber will be filled with nitrogen to a point where 90% of the atmosphere in the chamber consists of nitrogen.

85. When those events are complete, corrections officers wearing self contained oxygen units will open the hyperbaric chamber door, slide the table with the prisoner into the hyperbaric chamber, and close the door to the hyperbaric chamber.

86. Nitrogen will be pumped into the hyperbaric chamber until the atmosphere is 100% nitrogen.

87. A 100% nitrogen atmosphere will be maintained in the hyperbaric chamber until the EKG monitor and leads are verified to be working correctly and indicate that the prisoner is dead.

88. Once the prisoner is dead, the gas in the hyperbaric chamber will be evacuated from the hyperbaric chamber.

**Method Two: Sequential, intramuscular injection of ketamine and fentanyl.**

89. Mr. Grayson will be executed with a sequential, intramuscular injection of ketamine and fentanyl.

90. The prisoner will be placed on the gurney in the execution chamber in full sight of all witnesses.

91. The prisoner's spiritual advisor, if any, will minister to the prisoner based on the previously approved spiritual advisor plan.

92. The prisoner will speak his final words, if desired.

93. EKG leads will be connected to the prisoner and to an EKG machine in sight of the witnesses. The EKG will be monitored throughout the process.

94. Designated personnel will perform an intramuscular injection of ketamine in a therapeutic dose based on weight.

95. Then, after 10 minutes, designated personnel will perform an intramuscular injection of 2 mg of fentanyl.

96. In the unlikely event the initial dose of fentanyl is insufficient to cause death, a second equal dose will be given after 10 minutes.

## CLAIMS FOR RELIEF

97. Plaintiff asserts two claims for injunctive and declaratory relief.

## CLAIM ONE

**Alabama's protocol for execution by nitrogen induced hypoxia violates Mr. Grayson's Eighth Amendment right to be free from cruel and unusual punishment because it does not ensure that prisoners are unconscious when**

**deprived of oxygen and does not contain safeguards to prevent hypoxia induced injury.**

98. Plaintiff incorporates paragraphs 1 through 97 in support of Claim One.

99. The Eighth Amendment guarantees every person the right to be free from cruel and unusual punishment.

100. A method of execution violates the Eighth Amendment if "the risk of pain associated with the State's method is substantial when compared to a known and available alternative." *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019) (citations and internal quotation marks omitted).

101. Assuming proper administration, if exposed to almost pure nitrogen gas, Plaintiff would lose consciousness within seconds, and experience no pain or discomfort while dying of asphyxiation within just a few minutes.

102. Defendant's protocol creates a substantial risk of unconstitutional pain during an execution.

103. If the flow of nitrogen were to stop while the prisoner is still alive, this could lead to brain damage from oxygen deprivation insufficient to kill the death sentenced prisoner.

104. Defendants' protocol also fails to prevent the almost certain risk of agony associated with conscious deprivation of oxygen.

105. First, there is no provision that the death sentenced prisoner be sedated prior to being deprived of oxygen.

106. *Baze* makes clear that conscious suffocation during an execution violates the Eighth Amendment. *Baze*, 553 U.S. at 53.

107. Plaintiff's feasible and available alternative protocol for inducing nitrogen hypoxia lowers the almost certain risk of agony associated with the conscious deprivation of oxygen under the present protocol.

108. Plaintiff's feasible and available alternative protocol for execution by intramuscular injection of ketamine and fentanyl lowers the almost certain risk of agony associated with the conscious deprivation of oxygen under the present protocol.

109. Intramuscular injection of 10mg of ketamine prior to induction of hypoxia would resolve this issue.

110. The death sentenced prisoner would then be sedated prior to being deprived of oxygen.

111. This would reduce the mental and physical anguish surrounded by being deprived of oxygen while conscious.

112. Giving the death sentenced prisoner a sedative prior to beginning the hypoxia process will also decrease the possibility of the prisoner holding their breath.

113. Second, the protocol does not require the mask to be properly fitted to the individual wearing the mask.

114. Cynthia Stewart testified Defendant ADOC would not fit the mask to each individual death sentenced prisoner.

115. Improper mask fitting allows oxygen to enter Defendants' system, making the process last longer and increasing the mental and physical experience of suffocation.

116. Defendants' protocol also does not consider residual oxygen in the tubing and other parts of their nitrogen execution system.

117. This oxygen must be accounted for in determining how long it would take for nitrogen induced hypoxia to work.

118. As testified to by Defendants' expert in the *Smith* case, the more oxygen in the system the longer it takes to induce hypoxia.

119. Alone, or in combination with an ill-fitting mask, this excess oxygen in the system significantly increases the risk of a torturous execution in violation of the Eighth Amendment.

120. Thus, Plaintiff has established a valid Eighth Amendment violation, requiring an order prohibiting his execution under the present nitrogen hypoxia protocol.

### CLAIM TWO

**Defendants' execution protocol creates a substantial risk of hypoxia induced injury because it does not provide for a pre-execution physical to check for upper airway obstructions, the ADOC employees assigned to check and maintain the equipment are not adequately trained in using the equipment properly, and the ADOC does not train their employees sufficiently to use the mask to kill a prisoner.**

121. Plaintiff incorporates paragraphs 1 through 120 in support of Claim One

122. Inadequate delivery of nitrogen has a high risk of causing hypoxia induced brain injury instead of death.

123. Causing such injury and leaving the prisoner alive violates the Eighth Amendment.

124. Numerous aspects of the Defendant's protocol increase the risk of hypoxia induced injury, leaving the prisoner brain damaged, but not dead.

125. Individuals with upper airway obstruction issues, which include but are not limited to sleep apnea, deviated septum, and asthma with wheezing, will not breathe as much as individuals without these issues. This will cause the process to be delayed in a way that violates the Eighth amendment. A physical prior to execution would allow for recognition of such issues.

126. Defendants' nitrogen execution protocol includes an arbitrary time-based criterion requiring that nitrogen be given to the death sentenced prisoner through a mask for 15 minutes or until 5 minutes after the prisoner shows a flat line on an EKG, whichever is longer.

127. The medical definition of death is not based on the duration of a hypoxic insult. There is no factual or medical basis for picking time on the clock in this instance.

128. The prisoner is to have a pulse oximeter as well as be connected to an EKG.

129. Those items are required to be checked prior to the execution. The protocol does not indicate the training levels, if any, of the individuals required to check that equipment.

130. The protocol does not provide for monitoring the accuracy of this equipment as the execution progresses.

17

131. Pulse oximeters may become dislodged during the process and create false readings indicating that the prisoner is dead when they are still alive.

132. EKG machines also have artifacts that could provide false readings during the execution.

133. An example of an event that could result in a false reading would be if one of the EKG leads becomes loose during the execution.

134. Because of the time limit placed on the application of nitrogen in the protocol, errors in that equipment could lead to stopping the flow of nitrogen while the prisoner is still alive but having sustained brain injury without death.

135. Defendants' failure to provide safeguards related to the equipment monitoring the prisoner's life creates a substantial risk of hypoxia induced injury during a nitrogen execution.

## PRAYER FOR RELIEF

For the above reasons, Plaintiff respectfully requests that this Court:

1) Issue an order prohibiting Defendant Ivey from setting an execution for Mr. Grayson until one of his humane alternative methods is adopted for use in his execution.

2) Issue an order prohibiting Defendants ADOC, Hamm, and Raybon from executing Mr. Grayson using any method other than one of his alternatives.

3) Issue an order that Defendant Marshall file a motion to withdraw his motion to set an execution date, or if that motion is already granted before such an order is issued,

order Defendant Marshall to move to vacate the execution warrant authorizing Defendant Ivey to set an execution timeframe using the current nitrogen hypoxia protocol.

4) Issue an order declaring Alabama's current nitrogen execution protocol unconstitutional, and enjoining Defendants Hamm, Raybon, and ADOC, from executing Mr. Grayson using that protocol, enjoining Defendant Marshall from seeking an execution warrant for Mr. Grayson under that protocol, and enjoining Defendant Ivey from setting an execution timeframe; and

5)  Grant such other relief as this Court finds proper and just.

/s/John Anthony Palombi
John Anthony Palombi
Kentucky Bar No. 86784
John_Palombi@fd.org

/s/Spencer J. Hahn
Spencer J. Hahn
Oregon Bar No. 043027
Spencer_Hahn@fd.org

/s/Eric Brown
Eric Brown
Colorado Bar No. 57721
Eric_Brown@fd.org

/s/Kacey L. Keeton
Kacey Leigh Keeton
Alabama Bar No. ASB-0880-k50k
Kacey_Keeton@fd.org

/s/Matt D. Schulz
Matt D. Schulz
Nebraska Bar No: 22968

Matt_Schulz@fd.org

Federal Defenders
817 S. Court Street
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353

## CERTIFICATE OF SERVICE

This complaint was filed on June 28, 2024. Service will be carried out by this Court's accepted procedures for service of process by indigent plaintiffs.

/s/ John Anthony Palombi
John Anthony Palombi