IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CAREY DALE GRAYSON,

    Plaintiff,

    v.

JOHN Q. HAMM, Commissioner,
Alabama Department of Corrections,

TERRY RAYBON, Warden,
Holman Correctional Facility,

STEVEN MARSHALL, Attorney
General, State of Alabama, and

KAY IVEY, Governor, State of
Alabama.

    Defendants.

No. 24-cv-376-RAH-KFP

**CAPITAL CASE**
**Execution Set for**
**November 21-22, 2024**

**PUBLIC VERSION**

---

**PLAINTIFF'S POST-HEARING BRIEF
IN SUPPORT OF PRELIMINARY INJUNCTION**

---

On November 21, 2024, barring an injunction from this Court, Mr. Grayson will be consciously suffocated by Defendant Raybon using a protocol developed and tested by Defendant Marshall. Mr. Grayson has presented evidence, including from the execution team captain, that Kenneth Smith and Alan Miller remained conscious for minutes following the administration of nitrogen gas. He has also shown two

1

feasible alternatives each of which significantly reduces the risk of the unconstitutional suffering caused by the existing protocol. Because Mr. Grayson has a substantial likelihood of success on the merits, and the remaining equities favor him, this Court should issue a preliminary injunction barring his execution by any means other than his two alternatives until his lawsuit has concluded.[1]

I. **Mr. Grayson has a substantial likelihood of success on the merits of his claim the Protocol violates the Eighth Amendment.**

Kenneth Smith and Alan Miller showed signs of conscious suffocation for minutes following Defendant Raybon's administration of nitrogen gas.[2] Defendants can obtain midazolam, ketamine, and fentanyl, for executions, and have access to personnel capable of performing intramuscular injections. The evidence supports the conclusion that the State's current Protocol for carrying out executions by nitrogen hypoxia is likely to induce conscious suffocation, and sedation with midazolam and ketamine, as provided in Mr. Grayson's first alternative, will substantially reduce this risk.[3] Given the evidence received so far, there is a substantial likelihood Mr.

---

[1] Mr. Grayson's Motion for Preliminary Injunction, ECF Doc. 30 at 17-21, and Reply in Support of Motion for Preliminary Injunction, ECF Doc. 71 at 11-13, adequately establish the balance of equities, including the public interest in permitting this case to go to trial and preventing irreparable harm, favor him, and he will not repeat them here.

[2] Defendant Raybon's actions occurred in facilities controlled by Defendant Hamm, on dates set by Defendant Ivey, and under a protocol drafted by Defendant Marshall.

[3] By its very nature, Mr. Grayson's second alternative—intramuscular injection of ketamine and fentanyl—also substantially reduces the risk of conscious suffocation because it does not involve inert gas asphyxiation or a paralytic.

Grayson will succeed on the merits of his claim that the Protocol violates the Eighth Amendment and that one (or both) of his alternatives substantially reduce the significant risk of unconstitutional pain and suffering caused by the Protocol.

### A. The Protocol causes prisoners to remain conscious for several minutes after the nitrogen begins flowing.

Before the execution of Kenneth Smith by nitrogen hypoxia, Defendants Hamm, Raybon, and Marshall represented to this Court their Protocol would "cause unconsciousness within seconds" of nitrogen flowing into the mask. Evid. Hr'g Tr. I-52:14-I-53:2. They have been proven wrong. Twice.

Brandon McKenzie has been the ADOC's execution team captain at "six to eight" executions, including the nitrogen hypoxia executions of Messrs. Smith and Miller, as well as the unsuccessful attempts to execute them by lethal injection. Evid. Hr'g Tr. I-143:1-I-144:7. Captain McKenzie is responsible for consciousness checks during both lethal injection and nitrogen hypoxia executions. Evid. Hr'g Tr. I-51:11-16. According to Captain McKenzie, Mr. Smith was conscious for "a few minutes" or "several minutes or so" and for what "seemed like a while" *after* the nitrogen began to flow. Evid. Hr'g Tr. I-146:14-I-147:9, I-156:17-I-157:2.[4] Captain

---

[4] The formal consciousness assessment was not performed until ▮ minutes after the nitrogen began to flow. ECF Doc. 84-9 (Pl's Ex. 13) (HIGHLY CONFIDENTIAL), at 11 (ADOC 12220); Evid. Hr'g Tr. I-141:8-21 (Defendant Raybon: the first code "is telling everybody else on the team that I have began [sic] the process. I have turned it [the nitrogen] on"). The final "code," indicating "the execution is completed," Evid. Hr'g Tr. I-134:5-6, was given ▮ minutes later. Pl's Ex. 13 at 11 (ADOC 1220).

3

McKenzie's testimony about when Mr. Miller lost consciousness was limited to his observation that, "after about six minutes," Mr. Miller "appeared unconscious" or "to be deceased." Evid. Hr'g Tr. I-151:1-12. Bolstering Captain McKenzie's testimony are various witnesses' accounts of movement and breathing issues exhibited by both men.[5] *See, e.g.*, ECF Doc. 79-1 (statements of media witnesses). Further, Defendants' own expert testified, "If it [nitrogen] was given slowly and someone was slowly developing hypoxia, there could be suffering[.]" Evid. Hr'g Tr. II-98:25-99:1.

Subjecting a conscious person to several minutes of oxygen deprivation is constitutionally impermissible suffocation. *See, e.g.*, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 132 (D.C. Cir. 2020) (complaint adequately pled an Eighth Amendment claim by alleging pulmonary edema was likely to develop while the prisoner was conscious, which "causes extreme pain, terror and panic," because "not being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to humans" which could be

---

[5] While witness interpretations differ, with Defendant Hamm and other defense witnesses characterizing the movements as involuntary and the gasping as "agonal breathing," descriptions of physical movements generally matched up. *See, e.g.*, Evid. Hr'g Tr. I-89:10-22 (Defendant Hamm describing movements of both Messrs. Smith and Miller as "involuntary" and disagreeing "with the news accounts that Miller was gasping for breath" as opposed to experiencing agonal breathing). However, it is unlikely "a lay person without medical training" could "easily distinguish between agonal breathing versus consciously gasping for air against an upper airway constriction[.]" Evid. Hr'g Tr. I-183:18-21. Further, Defendant Hamm, who has witnessed "15 or 16" executions, Evid. Hr'g Tr. I-91:10-12, has never seen anyone executed by lethal injection "struggle against the restraints." Evid. Hr'g Tr. I-92:2-5.

avoided by providing "a pre-pentobarbital dose of a pain-relieving anesthetic drug [like] fentanyl") (internal punctuation omitted). If this Court credits Captain McKenzie's consciousness testimony, it must conclude that failure to sedate Mr. Grayson before killing him by nitrogen hypoxia[6] creates a substantial risk of significant and unnecessary suffering in violation of the Eighth Amendment.

> **B. Both of Mr. Grayson's alternatives significantly reduce the substantial risk of unconstitutional pain caused by the Protocol.**

Defendants' medical expert, anesthesiologist Joseph Antognini, M.D., has testified for defendants and against prisoners challenging three-drug lethal injection protocols like Alabama's (midazolam, a paralytic, and potassium chloride). Evid. Hr'g Tr. II-84:25-II-86:13. According to Dr. Antognini, "a person given 500 milligrams of midazolam" intravenously "would be rendered completely unconscious and insensate to pain and [noxious] stimuli." Evid. Hr'g Tr. II-86:2:9. The second drug paralyzes the muscles, including the diaphragm, and "if you were to inject someone with" the paralytic "without the midazolam dose first, they would feel the sensation of not being able to breathe." Evid. Hr'g Tr. II-86:14-87:1. "[L]ack of breathing, or apnea, can be a noxious stimulus if you're conscious." Evid. Hr'g

---

[6] Defendants, parsing *Baze v. Rees*, 553 U.S. 35 (2008), assert conscious suffocation alone does not violate the Eighth Amendment. *See, e.g.*, ECF Doc. 52 at 16-17. Mr. Grayson maintains this misreads precedent and is inconsistent with Defendant Marshall's position—in a context in which it benefited him—that conscious suffocation by itself is heinous, atrocious, and cruel. Pl's Ex. 23, ECF Doc. 84-17, at 5 (describing the victim's death by suffocation as, *inter alia*, "*unnecessarily torturous*") (emphasis added; citation and internal quotation marks omitted).

5

Tr. II-89:12-14. "[T]he first drug, midazolam, is intended to prevent that feeling from occurring[.]" Evid. Hr'g Tr. II-87:2-4.[7] Five hundred milligrams of midazolam would prevent a prisoner from sensing pulmonary edema, and in fact, "midazolam is considered by some to be a treatment to relieve the anxiety produced by pulmonary edema[.]" Evid. Hr'g Tr. II-91:16-92:9.

Dr. Antognini averred that sounds described by witnesses to Donnie Johnson's execution—"gurgling, snoring, gasping," and "high pitched ahs"—were "totally consistent with someone who is breathing through an obstructed airway." Evid. Hr'g Tr. II-95:11-24. That was not a concern, however, "[b]ecause," given "the midazolam dose, any such obstructed breathing would not be painful." Evid. Hr'g Tr. II-96:1-4. Thus, Defendants' own expert witness established breathing through an obstructed airway—during an execution no less—without sedation would be painful. Moreover, euthanizing non-avian animals via inert gas hypoxia "is unacceptable for other [non-pig] mammals" unless "they are rendered unconscious via an acceptable method[.]" Amer. Veterinary Med. Ass'n, AVMA Guidelines for the Euthanasia of Animals: 2020 Ed. at 28; *id.* at 22 ("The suitability of any

---

[7] The midazolam is also intended to prevent "the sensation of potassium chloride, which can be painful *as well*[.]" Evid. Hr'g Tr. II-87:5-11 (emphasis added).

particular inhaled agent for euthanasia therefore depends largely on distress and/or pain experienced prior to loss of consciousness.").[8]

Dr. Brian McAlary opined repeatedly, including "with reasonable medical probability," Mr. Smith suffered negative pressure pulmonary edema (NPPE) caused by an obstructed airway. *See, e.g.*, Evid. Hr'g Tr. I-209:11-210:2, I-216:21-217:2. NPPE occurs when a person attempts to breathe through or against an airway obstruction, resulting in pressure in the lungs sufficient to cause fluid from the bloodstream to be drawn into the lungs. *See, e.g.*, Evid. Hr'g Tr. II-56:8-23. In Mr. Smith's case, the obstruction resulted from a laryngospasm caused by the high level of anxiety and stress resulting from awareness of impending suffocation and/or the high flow rate of nitrogen in the Protocol. *See, e.g.*, Evid. Hr'g Tr. II-23:2-8 ("[f]ear and/or air flow and/or secretions"). "Within a second or two" of an airway obstruction, the person would begin to "tak[e] forced inspiratory efforts to try to overcome that choking sensation." Evid. Hr'g Tr. I-179:7-13. "[I]n the case of a severe effort to overcome airway problems, it usually is going to take anywhere from three to five minutes before you start breaking down the lung enough to get significant pulmonary edema." Evid. Hr'g Tr. I-179:14-21.[9]

---

[8] The relevant portion of the AVMA Guidelines (attached as Ex. A) were attached to Pl.'s Resp. to Defs.' Interrogatories (attached as Ex. B).

[9] This three-to-five-minute range lines up with Captain McKenzie's estimate of how long Mr. Smith remained conscious after nitrogen began flowing.

7

NPPE cannot occur in a person who is unconscious because an unconscious person "does not generate enough sucking effect, trying to get air into the lung, to be able to create the force to pull the fluid in." Evid. Hr'g Tr. I-178:1-5. Therefore, "[a]t least the majority of" the pulmonary edema Mr. Smith experienced occurred "during the period of time while he was conscious[.]" Evid. Hr'g Tr. I-178:6-9. The obstruction leading to NPPE—and awareness of suffocation—can be prevented by sedating the prisoner before beginning the nitrogen flow. Evid. Hr'g Tr. I-192:23-193:12; ECF Doc. 30-9 (McAlary Aff.) at ¶¶ 12-13. The intramuscular dose of ketamine proposed in Mr. Grayson's first alternative—4 mg/kg, ECF Doc. 42 ¶ 86—alone is at the upper limit to sedate, and at the lower limit to induce, general anesthesia. Miller's Anesthesia (7th ed.) (Ronald D. Miller ed., Churchill Livingstone 2010), at 746 (Table 26-9).[10]

### C. Mr. Grayson's proposed alternatives are feasible.

ADOC obtains the drugs it uses in lethal injection executions, including midazolam (a controlled substance), from a licensed pharmacist. Evid. Hr'g Tr. I-73:2-11.[11] Defendants have access to a "▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮▮"

---

[10] "Lower doses are used [to induce general anesthesia] if adjuvant drugs such as midazolam or thiopental are also given." *Id.* The table is contained in Pl.'s Resp. to Defs.' Interrogatory No. 4. Ex. A.

[11] Defendants have refused to "[e]xplain the procedures and policies by which ADOC obtains the drugs used in lethal injection executions." Defs.' Resp. to Pl.'s Interrogatory No. 7 ("Defendants object to this interrogatory because it seeks information that is not relevant to the claims or defenses of either party, thus it is overbroad," but offering "to confer with Plaintiff on this matter if Plaintiff believes that he can establish the relevance of the requested information to the amended

8

to ███████████████████████████████ immediately prior to a nitrogen hypoxia execution. Pl's Ex. 5, ECF Doc. 84-4 (Miller Settlement) (HIGHLY CONFIDENTIAL), at ¶¶ 1, 2, and 5. And Defendants agree "██████████ ████████████████████████████████████████████████" under ████████████████████████████████████████ *Id.* at ¶ 5. ADOC can employ ██ ██████████████████████████████ to assist in executions. Pl's Ex. 14, ECF Doc. 84-10 (HIGHLY CONFIDENTIAL), at 28; Evid. Hr'g Tr. I-45:6-46:1 (Defendant Hamm agreeing the first paragraph of page 28 "accurately reflect[s] ADOC's current capabilities" and declining an opportunity to hedge or qualify that agreement). This is all consistent with the regular and recent use of █████████ by other states that conduct executions. *See, e.g.*, ████████████████████████████████ ███████. ADOC considers execution related purchases to be exempt from public disclosure, including under the Open Records Act. Evid. Hr'g Tr. I-72:10-16. As such, no provider needs fear exposure as the supplier of drugs (or nitrogen) used in Alabama executions.[12] Ketamine is available to departments of corrections for

---

complaint *and* motion for preliminary injunction.") (emphasis in original). Defendants' refusal to provide this information (and inability to provide answers via Defendant Hamm, Evid. Hr'g Tr. I-73:2-74:3) should weigh heavily against them in assessing the equities.

[12] This secrecy has been successful. Since ADOC adopted midazolam as the first drug in the lethal injection protocol in 2014 it has used it in 19 executions, most recently on October 17, 2024.

9

executions,[13] as is fentanyl.[14]

Members of the IV team participate in nitrogen hypoxia executions, Evid. Hr'g Tr. I-101:25-102:4, and can perform an intramuscular injection as called for in both of Mr. Grayson's alternatives. Evid. Hr'g Tr. II-100:18-101:10. ADOC has, and has no trouble obtaining, intravenous midazolam for executions. Evid. Hr'g Tr. I-75:7-17. And "[m]idazolam prepared for intravenous injection c[an] be ingested orally," and Dr. Antognini has even mixed cherry flavoring into IV-injectable midazolam for oral administration. Evid. Hr'g Tr. II-94:18-96:10. Apart from having midazolam, Defendants have not attempted to establish, much less established, drug shortages of ketamine or fentanyl.[15] Finally, Defendants' have access to ███

---

[13] Nev. Dep't of Corr., Execution Manual, § 103.03, https://doc.nv.gov/uploadedFiles/docnvgov/content/Home/features/ExecutionManualRedactedandBatesAmended20110.pdf (attached as Ex. C); Press Release, Utah Dep't of Corr., Lethal Injection Drugs Identified for Potential Execution, June 7, 2024, https://corrections.utah.gov/wp-content/uploads/2024/06/06-07-2024-Lethal-Injection-Drugs-press-release.pdf (announcing "Ketamine, Fentanyl, and Potassium Chloride. Ketamine serves as an anesthetic, Fentanyl relieves pain, and Potassium Chloride stops the heart.") (attached as Ex. D). Exhibits C and D were cited in Pl.'s Resp. to Defs.' Interrogatory No. 3. (Ex. A).

[14] *Id.*; Neb. Dep't of Corr. Svcs., NDCS Provides Notice of Substances to be Employed in an Execution by Lethal Injection, Jan. 19, 2018, https://corrections.nebraska.gov/ndcs-provides-notice-substances-be-employed-execution-lethal-injection-0 (announcing drugs to be used in the execution of Carey Dean Moore with "substances . . . administered intravenously in the following order: 1) Diazepam; 2) Fentanyl Citrate; 3) Cisatracurium Besylate and 4) Potassium Chloride" and confirming "NCDS is in possession of the [named] substances") (Ex. E); Neb. Dep't of Corr. Svcs., NDCS carries out execution of Carey Dean Moore, Aug. 14, 2018, https://corrections.nebraska.gov/ndcs-carries-out-execution-carey-dean-moore (confirming execution of Carey Dean Moore) (Ex. F).

[15] Further, YesCare and ADOC "have the ability to provide fentanyl," and have done so in "patch form." Evid. Hr'g Tr. I-118:23-119:3. While YesCare provides drugs pursuant to a formulary, in signing a billion-dollar contract with ADOC, YesCare expressed no concerns about any drug's availability. Evid. Hr'g Tr. I-119:9-16. While Defendants emphasized, through questioning of Ms.

████ and ████████████████████████████

████████████████████████.

The protections of the Eighth Amendment are the same in Alabama as in any other State. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 412, *as modified* (Oct. 1, 2008), *opinion modified on denial of reh'g*, 554 U.S. 945 (2008) ("the separate States are bound by the proscriptive mandates of the Eighth Amendment . . . and all persons within those respective jurisdictions may invoke its protection."). Thus, Defendants cannot rely on their own ineptitude or inaction to claim Mr. Grayson's proposed alternatives are not feasible. Defendants' access to drugs (or ability to get them, as demonstrated by other departments of corrections) and personnel capable of giving intramuscular injections make Mr. Grayson's alternatives feasible.[16]

## II. Mr. Grayson is not guilty of delay and an injunction would not be futile.

Mr. Grayson expects Defendants will rely heavily on his deposition testimony and prior litigation—as they did at the hearing—to assert Mr. Grayson brought, and

---

Crook, *see* Evid. Hr'g Tr. I-110:1-111:7, I-113:8-17, that YesCare is responsible for all healthcare decisions for prisoners, that is not legally true. *See, e.g.*, *Braggs, et al. v. Hamm, et al.*, No. 2:14-cv-601-MHT (M.D. Ala.) (long running lawsuit challenging as constitutionally inadequate, *inter alia*, ADOC's prisoner health services). Ultimately, YesCare is an agent (the most recent among several) of ADOC, with ADOC bearing ultimate responsibility. In *Braggs*, the parties, including Defendant Hamm, recognized prison health service providers as non-parties. *See, e.g.*, Mediation Agreement Pertaining to Discovery, *id.* (Sept. 9, 2015), ECF Doc. 250-1 at 1-2 (agreement among plaintiffs, defendants, "and non-party **CORIZON HEALTH, INC.**") (bold and capitalization in original).

[16] ADOC has not attempted to obtain ketamine or fentanyl, Evid. Hr'g Tr. I-74:4-9, "put any execution-related materials orders out to bid," or sought "request[s] for proposal[s]" for them. Evid. Hr'g Tr. I-72:2-6.

prosecutes, this suit for purposes of delay and that any injunction would be futile because he would not cooperate with his alternatives. This is neither persuasive nor sufficient to overcome the balance of the equities. Some of what Defendants will likely attempt to attribute to Mr. Grayson stems from earlier litigation that he settled with Defendants Hamm and Raybon. Despite Defendants' efforts to tie them together, any delay resulting from that lawsuit cannot be attributed to this lawsuit.[17] And Mr. Grayson's professed unwillingness to cooperate with *any* method of execution does not render an injunction requiring employment of one (or both) of his alternatives futile.[18]

In response to Defendants' arguments at the hearing, this Court asked counsel how to take certain portions of Mr. Grayson's deposition from which it could be inferred this litigation was brought for purposes of delay. Evid. Hr'g Tr. I-19:10-20:10. As counsel explained, most of this Court's references went back to events from previous litigation, when Mr. Grayson (and others) pled nitrogen hypoxia as an alternative to a three-drug midazolam-first protocol. Evid. Hr'g Tr. I-20:1-10. That has nothing to do with this litigation. The parties, including Defendants Hamm and Raybon (through their predecessors), settled the earlier suit with Mr. Grayson

---

[17] This is notwithstanding the fact that Defendants Hamm and Raybon (or their predecessors) settled the lawsuit on the eve of a trial on the merits following Mr. Grayson's successful appeal from the dismissal of the earlier action.

[18] Mr. Grayson's first alternative—which calls for an oral dose of midazolam—anticipates and addresses non-cooperation. ECF Doc. 42 at ¶ 84 n.19.

reserving his right to challenge any nitrogen protocol. Despite Defendants' efforts to tie them together, any delay resulting from that lawsuit cannot be attributed to this lawsuit.[19]

As explained in earlier pleadings, Mr. Grayson is not guilty of delay based on his recent actions, *see, e.g.*, ECF Doc. 30 at 19-21, and his deposition testimony must be considered in context. Those statements were made by a person (1) with a history of serious mental health issues (2) who had recently ingested two controlled substances (one lawfully prescribed and the other obtained illicitly) (3) just days after a fellow prisoner was consciously suffocated using the method he is challenging (4) on the premises where the deposition was taken and (5) contemporaneous to his being asked about midazolam, a drug he challenged in his previous lethal injection suit. Moreover, they are the words of someone who does not want to die and was exhibiting bravado while being confronted by people who want to execute him on a date certain.

Finally, Mr. Grayson's testimony, that he would not cooperate with any attempt to execute him by any method, can hardly mean any attempt to execute him—including under the Protocol—would be futile because cooperation is not a prerequisite to that method or the alternatives Mr. Grayson proposed.

---

[19] If anything, the delay comes from the fact that the legislature approved a new method of execution before there was a protocol or precedent for that method. It took the State more than five years after the opt-in deadline to announce the nitrogen protocol.

The Eighth Amendment does not require a death-sentenced prisoner to help the State execute him or accept his fate with grace. This Court should reject Defendants' attempts to paint Mr. Grayson as a bad faith actor intent on delay and that any relief would be futile. He is, instead, a man who does not want to be executed, but knowing he must, wishes to avoid being consciously suffocated before meeting his maker.

## CONCLUSION

Mr. Grayson has a substantial likelihood of success on the merits, and the balance of the equities—including irreparable harm—also weigh in his favor. This Court should enjoin Defendants from executing Mr. Grayson by any means other than one of his alternatives until this litigation is resolved.

Respectfully submitted this 24th day of October, 2024.

/s/John Anthony Palombi
John Anthony Palombi
John_Palombi@fd.org

/s/Spencer J. Hahn
Spencer J. Hahn
Spencer_Hahn@fd.org

/s/Eric Brown
Eric Brown
Eric_Brown@fd.org

/s/Kacey L. Keeton
Kacey Leigh Keeton
Kacey_Keeton@fd.org

/s/Matt D. Schulz
Matt D. Schulz
Matt_Schulz@fd.org

Federal Defenders for the
Middle District of Alabama
817 S. Court Street
Montgomery, Alabama 36104
(334) 834-2099

## CERTIFICATE OF SERVICE

I certify the foregoing was filed, on October 24, 2024, and a copy was served, by e-mail, on counsel for Defendants.

/s/ John Anthony Palombi
John Anthony Palombi