IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CAREY DALE GRAYSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:24-cv-00376-RAH |
| | ) | |
| JOHN Q. HAMM, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

In 1996, a jury convicted Carey Dale Grayson of capital murder and the lesser included offense of intentional murder. Grayson was sentenced to death. Now he awaits execution for a second time, currently scheduled for November 21, 2024, via nitrogen hypoxia. If it goes forward, this will be the third nitrogen hypoxia execution in the State of Alabama in 2024.

On June 28, 2024, Grayson filed a Complaint against John Q. Hamm (Commissioner of the Alabama Department of Corrections), Terry Raybon (Warden at the William C. Holman Correctional Facility), the Alabama Department of Corrections (ADOC), Steven T. Marshall (Alabama Attorney General), and Kay Ivey (Governor of the State of Alabama) asserting Eighth Amendment claims challenging the constitutionality of the ADOC's nitrogen hypoxia execution protocol. Grayson subsequently moved for a preliminary injunction, seeking to

enjoin the Defendants from executing him under the current protocol. After Grayson filed his preliminary injunction motion, he filed an Amended Complaint, to which the Defendants filed a motion to dismiss, which remains pending. On October 8 and 9, 2024, the Court held a hearing on Grayson's preliminary injunction motion.[1] Following that hearing, the parties filed supplemental briefs.

The motions are fully briefed and therefore are ripe for decision. For the reasons that follow, the Court will grant in part and deny in part the Defendants' motion to dismiss and will deny Grayson's motion for preliminary injunction.

## II. BACKGROUND

In August 2023, Alabama became the first state in the country to announce a protocol for an execution by nitrogen hypoxia. (*See* doc. 30-12; doc. 30-13.) Since that time, two condemned inmates have been executed via that method – Kenneth Smith and Alan Miller.

On August 12, 2024, the Alabama Supreme Court authorized the ADOC to execute Grayson. Governor Kay Ivey then ordered his execution for a thirty-hour time frame beginning at 12:00 a.m. on November 21, 2024, and expiring at 6:00 a.m. on November 22, 2024. Since Grayson previously elected nitrogen hypoxia as his chosen method of execution, the ADOC has scheduled his execution via that method.

### A.    Grayson's Capital Litigation History

In 1996, a jury convicted Grayson of capital murder and the lesser included offense of intentional murder. *Grayson v. State*, 824 So. 2d 804, 808 (Ala. Crim. App. 1999), *aff'd by Ex parte Grayson*, 824 So. 2d 844 (Ala. 2001). Grayson was

---

[1] Grayson also filed an opposed motion for leave to amend paragraph 84 of the Amended Complaint on October 2, 2024. (Doc. 76.) The motion was orally granted at the preliminary injunction hearing.

sentenced to death. *Id.* at 808–09.  Later, Grayson exhausted all layers of appellate review, including direct appeal, state postconviction relief, and federal habeas corpus.

On February 22, 2012, the Alabama Supreme Court authorized Grayson's execution, which at that time was to be conducted via lethal injection.  But the state supreme court stayed the execution after Grayson filed a federal lawsuit challenging Alabama's lethal injection protocol under the Eighth and Fourteenth Amendments. [*See* Complaint, *In re: Alabama Lethal Injection Protocol Litigation*, No. 12-cv-00316 (M.D. Ala. Apr. 6, 2012), ECF No. 1.]  In that litigation, Grayson claimed that nitrogen gas introduced through a mask (i.e., nitrogen hypoxia) was a more humane and constitutional method of execution than the ADOC's then-existing lethal injection protocol.  [*Id*.; ECF No. 348 at 32–33.]  Ultimately, Grayson's lawsuit was dismissed as moot after the Alabama legislature approved nitrogen hypoxia as another acceptable method of execution in Alabama, and Grayson was permitted to elect it.

**B.    The ADOC's Nitrogen Hypoxia Execution Protocol**

In June 2018, Alabama's statutory amendment, *see* Ala. Code § 15-18-82.1(b), allowing execution by nitrogen hypoxia, went into effect.  Litigants challenging Alabama's lethal injection protocol advanced nitrogen hypoxia as the preferred feasible alternative, and sometimes more humane, method of execution. *See, e.g*., *Smith v. Hamm*, No. 22-cv-497, 2023 WL 4353143, at *5 (M.D. Ala. July 5, 2023); *e.g., Bucklew v. Precythe*, 587 U.S. 119, 142  (2019); *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1328 (11th Cir. 2019); *Miller v. Hamm*, No. 22-cv-506, 2022 WL 4348724, at *3 (M.D. Ala. Sept. 19, 2022), *vacated by Hamm v. Miller*, 143 S. Ct. 50 (2022).  Despite being an approved execution method, it was

3

not until August 2023 that the ADOC released a protocol for a nitrogen hypoxia execution.

Alabama's public version of the protocol is heavily redacted. But the crux of the protocol as it concerns nitrogen hypoxia is that pure nitrogen gas is introduced to the condemned inmate through an industrial-use respirator mask until the inmate is declared dead. The protocol also calls for the use of EKG and pulse oximeter devices to monitor the condemned inmate's condition until declared dead. The protocol does not call for the use of a sedative in advance of the initiation of nitrogen gas.

## C.    The Present Action

In his operative complaint, Grayson alleges that "the Protocol does not have sufficient safeguards to prevent conscious suffocation," and as a result, the protocol "violates the Eighth Amendment." (Doc. 42 at 11.)

Grayson argues that there are four main problems with the ADOC's current nitrogen hypoxia protocol: the lack of a pre-execution medical examination, the lack of sedation prior to initiation of the nitrogen gas, improper fit of the mask, and lack of proper monitoring of the mask, and EKG and pulse oximeter devices. He asserts that deprivation of oxygen while conscious will result in agony, including mental and physical anguish, and "[a]n improperly fitted mask will allow oxygen to enter [his] system, making the process last longer and increasing the mental and physical experience of suffocation." (*Id.* at 17.) He also alleges the protocol creates a risk of hypoxia-induced injury without causing death "because it does not provide for a pre-execution physical to check for upper airway obstructions, ADOC employees who check and maintain the equipment are not adequately trained, and [the] ADOC does not train their employees sufficiently to use the mask to kill a prisoner humanely."

4

(*Id.*)   Further, he alleges that the execution process will be prolonged because of upper airway obstruction issues, the protocol's requirement that an individual be given nitrogen through a mask for fifteen minutes is not supported factually or medically, and the protocol does not provide for the monitoring of the accuracy of the pulse oximeter and EKG devices, which aid in the determination of death.   (*Id.* at 18–19.)

Grayson currently[2] offers two allegedly feasible alternatives to the ADOC's current nitrogen hypoxia protocol: (1) a nitrogen hypoxia execution protocol that calls for the use of a sedative, or alternatively, (2) an injection of a sedative followed by a fatal dose of fentanyl.   (*Id.*)

Grayson moves for a preliminary injunction or stay of execution under his Eighth Amendment method-of-execution claims.   He asserts that "[t]he Protocol violates the Eighth Amendment because it creates an unnecessary risk of superadded pain and survivable hypoxia induced injury."   (Doc. 30 at 9.)   In support of his request for preliminary injunctive relief, Grayson submits a host of documents, (*see* doc. 30), including a transcript from a press conference held by Marshall after the nitrogen hypoxia execution of Kenneth Smith; Grayson's written opt-in election form for nitrogen hypoxia dated June 26, 2018; the State of Alabama's motion to set an execution date for Kenneth Smith; the State of Alabama's motion to set an

---

[2] Grayson initially offered in his original Complaint a different alternative whereby "[t]he prisoner shall be placed on a table and wheeled into the execution chamber, . . . [and a] monoplace hyperbaric chamber will be ready."   (Doc. 1 at 12.)   After the Defendants filed a motion to dismiss that Complaint, Grayson filed an Amended Complaint and dropped his hyperbaric chamber proposal.   (*See* doc. 42.)   Later in the case, claiming a scrivener's error, Grayson changed another aspect of his proposed alternatives when he changed the dosage amount of his proposed sedative. (Doc. 52 at 18–19.)   To put it bluntly, Grayson's proposed feasible alternatives have been a moving target in this litigation.

execution date for Grayson; the Alabama Supreme Court's order granting the State of Alabama's motion to set an execution date for Grayson; an acknowledgment of spiritual advisor form; a transcript of oral argument before the Eleventh Circuit Court of Appeals in *Smith v. Alabama Department of Corrections, Commissioner*; testimony from Kenneth Smith's preliminary injunction hearing; the affidavit of Dr. Brian McAlary, a board-certified anesthesiologist; the curriculum vitae of Dr. McAlary; records relied upon by Dr. McAlary; a copy of the ADOC's nitrogen hypoxia protocol; the autopsy report of Kenneth Smith following his execution; and Governor Ivey's letter setting Grayson's execution date.

In their written opposition, (*see* doc. 58), the Defendants submitted numerous documents as well, including a Safety and Health Bulletin from OSHA titled *Deaths Involving the Inadvertent Connection of Air-line Respirators to Inert Gas Supplies*; a U.S. Chemical Safety and Hazard Investigation Board Safety Bulletin titled *Hazards of Nitrogen Asphyxiation*; an OSHA Technical Information Bulletin titled *Exposure to Hazards Associated with Temporary Enclosures*; a Journal of the Korean Society of Clinical Toxicology case report titled *Attempted Suicide by Nitrogen Gas Asphyxiation: A Case Report*; and a Toxicology Communications case report titled *Computed tomography findings of asphyxial suicide by the inhalation of helium inside a plastic bag*.

## D. Evidence Presented at the Preliminary Injunction Hearing

On October 8 and 9, 2024, an evidentiary hearing was held on Grayson's preliminary injunction request. In addition to those exhibits previously submitted with his motion, Grayson presented 16 additional exhibits, and the Defendants presented 38. The evidence included affidavits and declarations from expert witnesses (Dr. Brian McAlary and Dr. Joseph Antognini), Grayson, and other party

and non-party witnesses (Captain Brandon McKenzie and attorney James R. Houts); the confidential settlement agreement from the Kenneth Smith protocol litigation; a purity analysis certificate for nitrogen gas; the activity/observation log from the Kenneth Smith execution; the user manuals for the pulse oximeters, EKG machines, and supplied air respirator; case reports and articles discussing the inhalation of inert gases and hypoxia (in the context of industrial accidents, suicides, airdrops, and epilepsy), pulmonary edema, intramuscular injections, breathing systems, PINACA intoxication following cannabis consumption, and midazolam and ketamine administration; AVMA guidelines for the euthanasia of animals; news articles describing the Smith and Miller nitrogen hypoxia executions; submissions in unrelated litigation filed in the Alabama Court of Criminal Appeals; Grayson's written opt-in election form for nitrogen hypoxia; Kenneth Smith's post-execution autopsy report; excerpts from the standards for health services in prisons; Grayson's designation of two of his attorneys (one as an alternative) as his spiritual advisors who would be present with him during his execution; pharmacological and usage information concerning midazolam, ketamine, and fentanyl; the transcript and video recording of Grayson's deposition; Grayson's responses to the Defendants' interrogatories; Grayson's responses to the Defendants' first requests for production; and Nevada's execution protocol.  The evidence also included testimony from ten witnesses – John Q. Hamm, Cynthia Stewart-Riley, Deborah Crook, Brandon McKenzie, Terry Raybon, James R. Houts, Dr. Brian McAlary, Dr. Shante Hill, Dr. Joseph Antognini, and attorney Richard Anderson.

All of the testimony and declarations will not be summarized here, but the following relevant testimony was provided.

John Q. Hamm: Hamm, the ADOC Commissioner, testified that he has the authority to amend the ADOC's execution protocol and that the Alabama Attorney General's Office was involved in drafting it. He also testified that he witnessed the Smith execution and personally observed Smith hold his breath and fight against his restraints before and after the nitrogen gas was turned on, which he believed was an attempt to disrupt the execution process. Hamm stated that he personally witnessed the Miller execution, and he noted that Miller did not hold his breath, nor fight his restraints, but that Miller did raise his head and experience agonal breathing. Finally, he testified that the ADOC lawfully obtains its lethal injection drugs from licensed pharmacists.

Cynthia Stewart-Riley: Ms. Stewart-Riley, the ADOC Regional Director and former warden for several executions, testified that she was not involved in the development of the protocol but is involved with training. She stated that there is no printed reading of the pulse oximeters' data during an execution, and there is no specific training on what to do if the oximeters and EKG devices fail during an execution. She was present for the Smith execution and did not observe Smith scream out in pain, but she did hear Smith say that he smelled the nitrogen gas. She also corroborated Hamm's testimony that Smith attempted to hold his breath during his execution.

Deborah Crook: Ms. Crook, the Deputy Commissioner of Health Services for the ADOC, testified that YesCare is the ADOC's medical provider. According to Ms. Crook, YesCare, as a healthcare provider, is prohibited from participating in an execution, including providing midazolam, ketamine, and fentanyl. But she also acknowledged that YesCare can fill an inmate's request for midazolam if YesCare determines the request to be therapeutically appropriate.

<u>Terry Raybon</u>:  Raybon, the warden at Holman, testified that he is responsible for implementing the protocol during an execution but that he was not involved in drafting the protocol.  He stated that during an execution, for redundancy reasons, there are two pulse oximeters and two EKG devices present.

<u>Brandon McKenzie</u>:  McKenzie, the execution team captain for the Smith and Miller executions, testified that during Kenneth Smith's execution, Smith was conscious for a few minutes before an EKG flatline occurred.  He further stated that he observed Smith hold his breath, try to sit up, fight the restraints, and then exhale after which the oxygen reading on the pulse oximeters dropped significantly from approximately 98–99% to 43–45%.  McKenzie also testified that during the Miller execution, he observed the oxygen reading on the pulse oximeters drop almost immediately to 45% within the first minute and that a grayish color appeared on Miller's body approximately 6 minutes after the execution started.

<u>James R. Houts</u>:  Houts, an Assistant Attorney General at the Alabama Attorney General's Office, testified that he created several videos mimicking a negative pressure test with a mask and that he suffers from an obstructive condition called sleep apnea.  He further stated that he wore the same type of respirator mask used during the Smith and Miller executions at the same execution gas flow rate on multiple occasions and that he did not experience any issues, distress, or bronchospasms.

<u>Dr. Brian McAlary</u>:  Dr. McAlary, Grayson's expert anesthesiologist, submitted an affidavit in which he opined that "there is an almost certain risk of agony due to the conscious deprivation of oxygen that will occur under the Protocol" based, in part, on the lack of a pre-execution medical examination, the lack of sedation prior to the execution, and the ADOC's use of correctional officers without

proper medical or scientific training (instead of trained doctors or nurses) "to monitor the flow of nitrogen gas into the mask" and the EKG and pulse oximeter devices. (Doc. 30-9 at 3–4, 7.) He also opined that, from his interpretation of Kenneth Smith's autopsy report, the fact that "Smith's lungs were filled with fluid and blood at the time of his death . . . is the result of negative pressure pulmonary edema." (*Id.* at 3–4.)

At the preliminary injunction hearing, Dr. McAlary testified similarly. He stated that, in his opinion, an individual will experience negative pressure pulmonary edema if the individual suffers from upper airway obstruction issues (such as laryngospasms) due to a medical condition, fear, or panic and that this likely occurred while Kenneth Smith was conscious during his nitrogen hypoxia execution. Dr. McAlary claimed that the nitrogen flow rate contained in the protocol invites the occurrence of bronchospasms which can obstruct the airway. He could not state, however, the likelihood in which the nitrogen flow rate would cause such bronchospasms. To address the risk of negative pressure pulmonary edema, Dr. McAlary opined that a pre-execution medical evaluation should be performed and a sedative, such as an oral dose or intramuscular injection of midazolam, should be given prior to initiation of the nitrogen gas.

On cross-examination, Dr. McAlary acknowledged that he could not compound or provide midazolam, or any other drug such as ketamine or fentanyl, for Grayson's execution, and he does not know of any doctor who would since medical professionals cannot participate in executions. He also admitted that the only pain caused by the nitrogen hypoxia protocol is psychological pain (not physical pain) associated with panic and anxiety. And as to ketamine, he

acknowledged that the drug may cause reactions such as respiratory depression and laryngospasms.

As to the issue of pulmonary edema, Dr. McAlary acknowledged that Kenneth Smith's autopsy report did not indicate negative pressure pulmonary edema or any obstruction of Smith's airways and that he has not diagnosed Grayson with an airway condition or any other medical condition. He admitted that the oral use of a sedative prior to or during an execution involves the cooperation of the inmate and that, specific to Grayson, he is aware that Grayson previously voiced his refusal to take midazolam. He also acknowledged the observations and findings in the case studies provided by the Defendants, which note that pulmonary edema typically occurs from asphyxiation and hypoxia and do not mention negative pressure pulmonary edema or airway obstruction.

And on the issue of edema, he acknowledged that, at autopsy, Smith tested positive for an illegal drug (synthetic cannabinoid), but in his opinion, Smith's use of that illegal drug did not cause Smith's pulmonary edema, nor did Smith's action of holding his breath.

Dr. Shante Hill: Dr. Hill, the medical examiner who performed the Smith autopsy, testified that she conducted Smith's autopsy and determined Smith's cause of death to be asphyxia due to inhalation of inert gas. She noted pulmonary congestion and edema but did not note or find negative pressure pulmonary edema or any evidence of an obstructed airway. Instead, she stated that pulmonary edema is a common finding in autopsies and is most common in those autopsies involving drug overdoses and asphyxiation.

Dr. Joseph Antognini: Dr. Antognini, the Defendants' expert anesthesiologist, submitted a declaration in which he opined that "[n]othing in the

11

Alabama protocol or the nitrogen hypoxia system . . . would lead to the inmate suffering pain." (Doc. 84-11 at 17.) At the preliminary injunction hearing, he further testified that he wore the respirator mask called for under the protocol at the protocol's required nitrogen flow rate and that he did not experience a bronchospasm or laryngospasm. He also stated that even brain-dead patients experience movement, that negative pressure pulmonary edema can occur in unconscious patients, and that nitrogen gas has no smell. Dr. Antognini opined that an inmate will not experience physical pain under the protocol but acknowledged that an inmate may experience anxiety and dread, as would be expected with any looming execution. As for Smith, he opined that Smith held his breath and that, per the toxicology report, Smith had used an illegal drug which could cause excitement and convulsions.

Dr. Antognini pointed out that Dr. McAlary's opinion that Smith experienced negative pressure pulmonary edema was unsupported by evidence and case studies. He explained that pulmonary edema is a common, non-specific finding in autopsies, even in lethal injection cases, and that there is no evidence that an obstruction of Smith's airway occurred. Therefore, the presence of pulmonary edema at autopsy is not indicative of a specific process and is also likely to occur in the moments preceding death or post-mortem. He highlighted that extreme hypoxia occurs in all cases that involve the inhalation of nitrogen, which can lead to pulmonary edema but that such events would occur after the person is unconscious. He noted that there was no evidence that pulmonary edema occurred while Smith was conscious. And in his opinion, the nitrogen flow rate under the protocol does not invite bronchospasms as Dr. McAlary suggested. Instead, it will lead to unconsciousness within 10 to 40 seconds after the nitrogen begins to flow depending on the variables including the inmate's own actions.

He also spoke to the issue of administering midazolam and ketamine as part of a nitrogen hypoxia execution. He testified that midazolam is sufficient to overcome the awareness of not being able to breathe, but administering midazolam orally is not as reliable as it being administered intravenously, which Grayson's protocol does not propose. He acknowledged that there are potential side effects with midazolam including airway obstruction and an increased risk of negative pressure pulmonary edema and nausea. As for ketamine, he testified that there also exist potential side effects, including increased risk of unconsciousness, obstructed airways, negative pressure pulmonary edema, and brain damage. Regarding Smith's pulmonary edema observed at autopsy, Dr. Antognini believed that it could have developed postmortem and that it is less likely to be neurogenic pulmonary edema.

<u>Richard Anderson</u>: Anderson, an assistant attorney general, testified that he attended the Miller execution. He observed that Miller breathed normally and that there was no indication that Miller held his breath. He also testified that after the execution began, Miller started breathing more rapidly, which continued for 1 minute, and that after Miller stopped breathing, he observed Miller's body make slight movements and twitches. He also observed agonal breathing.

### III. JURISDICTION AND VENUE

Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

### IV. DISCUSSION

The Court will first consider the Defendants' motion to dismiss and then Grayson's preliminary injunction motion.

13

**A.     The Defendants' Motion to Dismiss**

The Defendants move to dismiss Grayson's claims under Federal Rule of Civil Procedure 12(b)(6).  Their motion will be granted in part.

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the legal standard set forth in Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  When evaluating a motion to dismiss under Rule 12(b)(6), the court must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff."  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).  Yet "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679 (citation omitted).  But if the facts in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief,'" and the complaint must be dismissed.  *Id.* (alteration adopted) (citing Fed. R. Civ. P. 8(a)(2)).

### 1.    Jurisdiction

In their motion to dismiss, the Defendants raise standing concerns and the *Rooker-Feldman*[3] doctrine.   The Defendants also assert both claim and issue preclusion, Marshall's entitlement to prosecutorial immunity, and Marshall and Ivey's entitlement to quasi-judicial immunity.

### a.    Standing

Marshall and Ivey first raise standing concerns.  They argue that "[t]he only injury alleged is the risk of an unconstitutional execution," and therefore, "only Defendant Hamm can be held responsible for a refusal to change ADOC's protocol and to adopt one of Grayson's novel proposals."  (Doc. 52 at 7.)  They also contend that they are not the ones who threaten Grayson's injury and are only tangentially involved.  With redressability, they argue that Marshall cannot afford redress because "it is doubtful that this Court can compel the Attorney General to file a motion in a state proceeding or to decline to defend the Alabama Supreme Court's judgment."  (*Id.* at 10.)  They also assert that Ivey cannot redress an alleged unconstitutional execution because Grayson only seeks an order "prohibiting her from setting an execution for him until one of his alternative methods is adopted for use in his execution" and "enjoining her from setting an execution timeframe [sic] using the Protocol."  (*Id.* (cleaned up) (quoting doc. 42 at 20).)  According to Marshall and Ivey, "Ivey has already set the timeframe [sic] for Grayson's execution . . . . Now that her involvement in the execution process is complete, such an injunction would be completely ineffective."  (*Id.* at 10–11 (citation omitted).)

---

[3] *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983).

In contrast, Grayson contends that he has standing to sue Marshall and Ivey. Grayson argues that he has alleged Marshall was responsible for creating the nitrogen hypoxia protocol and that Marshall is implicated through unrelated litigation "in which he acknowledged his employee, with no scientific or medical training, trained Defendant Hamm's employee in how to place and secure the mask on a prisoner." (*Id.* at 10–11.)  Thus, according to Grayson, "he has established he will suffer an injury fairly traceable to Defendant Marshall." (*Id.* at 11.)  As to Ivey, Grayson asserts that Ivey has total control over whether and when to set or reset an execution timeframe, has the authority to grant a reprieve, and can order Hamm to implement one of Grayson's alternatives.  Moreover, according to Grayson, "a declaration that the current execution protocol violates the Eighth Amendment would redress [his] injury." (*Id.* at 12.)

Article III of the Constitution limits the subject matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2.  "'To have a case or controversy, a [plaintiff] must establish that he has standing,' which requires proof of three elements." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (quoting *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019)).  Those three elements include (1) an injury in fact that (2) is fairly traceable to the defendant's actions and is (3) likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000) (quoting *Lujan*, 504 U.S. at 561).

16

To begin with, a state-sponsored execution requires participation from several actors.  It follows a capital conviction and sentence, the legality of which Grayson could and did challenge in the state courts and in federal habeas proceedings. Separate from his previous capital litigation, the process of carrying out his execution is a discrete and narrow piece of Grayson's overall judicial process.

According to Alabama Rule of Appellate Procedure 8(d)(1), the sentencing court must *not* set an execution date at the time of sentencing but "may make such orders concerning the transfer of the inmate to the prison system as are necessary and proper."  Later, often measured in years if not decades, the execution clock starts ticking when the Alabama Supreme Court decides that it is the "appropriate time" to carry out the execution.  Ala. R. App. P. 8(d)(1).  A plain reading of Rule 8(d)(1) separates the act of sentencing from the act of green lighting the State of Alabama's request to carry out the death sentence, placing the two tasks in the hands of two different courts.

Accepting the Amended Complaint's allegations as true, Grayson has not sufficiently shown that he has Article III standing to sue Marshall and Ivey for the relief sought in the Amended Complaint.  Beginning with injury in fact, Grayson alleges that "[t]here is a substantial likelihood the Protocol, as employed in the . . . execution of . . . Smith, will cause . . . Grayson to be deprived of oxygen while he remains conscious until he dies[] and to experience suffocation."  (Doc. 42 at 11.) He alleges that because the nitrogen hypoxia protocol fails to adequately protect against conscious suffocation, the protocol violates his Eighth Amendment rights. In addition, Grayson alleges that because the protocol "does not provide for a pre-execution physical to check for upper airway obstructions," it "creates a substantial

risk of hypoxia induced injury." (*Id.* at 17.)  Such allegations are enough to establish an injury in fact.

As for traceability, with respect to Marshall, Grayson alleges that Marshall is responsible for starting the process for setting an execution date by filing a motion with the Alabama Supreme Court, and he is the individual who designates the method of execution.  Grayson also alleges that Marshall, with his staff, wrote the protocol and selects whom to request permission to execute.  Grayson's alleged injuries from conscious deprivation of oxygen and hypoxia-induced injury from the protocol's failure, for example, to require a pre-execution medical examination or sedation, are therefore sufficiently traceable to Marshall's conduct specifically related to the development and implementation of the nitrogen hypoxia protocol.

As to Ivey, Grayson alleges that she selects the time frame for the execution[4] and has the authority to grant a reprieve, but Grayson does not allege that Ivey selects the method of execution, had any role in the development of the protocol, or has a role in carrying out the protocol during an execution.  Under these allegations, Grayson's alleged injuries stemming from the protocol are not fairly traceable to Ivey's conduct in selecting the time frame for the execution or in the ability to grant a reprieve.  As such, there is no traceability to Ivey.

Turning to redressability, redressability "requires a plaintiff to seek a remedy that is likely to redress the injury which is fairly traceable to the challenged conduct." *See Smith v. Comm'r, Ala. Dep't of Corr.*, No. 21-13298, 2021 WL 4817748, at *4 (11th Cir. Oct. 15, 2021) (internal quotation marks, brackets, and citation omitted).

---

[4] Despite Grayson's statement in his opposition to the Defendants' motion to dismiss the Amended Complaint that Ivey can reset the execution time frame, (doc. 60 at 11), there is no such allegation in the Amended Complaint.

Here, Grayson fails to sufficiently allege redressability as to both Marshall and Ivey. As for Marshall, Grayson's requested relief includes an order that directs Marshall to "move to vacate the execution warrant authorizing Defendant Ivey to set an execution timeframe using the Protocol and not seek another warrant until one of [his] alternatives is adopted" and an order "enjoining Defendant Marshall from defending an execution warrant for . . . Grayson under the Protocol." (Doc. 42 at 20.) But Ivey already has set the time frame for Grayson's execution, and Grayson fails to show how Marshall can unilaterally vacate or stop it. Further, as to Ivey, Grayson's requested relief seeks an order that prohibits Ivey from setting an execution date for him until one of his proposed alternatives "is adopted for use in his execution" and an order "enjoining Defendant Ivey from setting an execution timeframe using the Protocol." (*Id.*) Such redress is moot given that Ivey already has set a time frame for Grayson's execution.

Redressability requires a plaintiff to seek a remedy that is likely to redress the injury which is fairly traceable to the challenged conduct. A judgment against the Alabama Attorney General would not significantly increase the likelihood of redressing Grayson's claimed injuries. *See Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018); *see also Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021) ("A judgment against the [Florida] Attorney General prohibiting her from enforcing [a statute] wouldn't significantly increase the likelihood of redressing the plaintiffs' injuries because . . . the Attorney General has no enforcement authority . . . ." (citing *Jacobson*, 974 F.3d at 1254)). Accordingly,

the Defendants' motion to dismiss is due to be granted as to Attorney General Steven Marshall and Governor Kay Ivey on standing grounds.[5]

### b.   *Rooker-Feldman* and Claim/Issue Preclusion

Beyond standing, Defendants[6] Hamm and Raybon seek dismissal under the *Rooker-Feldman* doctrine.  *Rooker-Feldman* is inapplicable here because Grayson filed his initial Complaint *before* the Alabama Supreme Court authorized his execution, meaning the present case commenced before the Alabama Supreme Court issued its judgment and therefore before the matter had ended. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (stating that the doctrine only applies to "cases brought by state-court losers complaining of injuries caused by *state-court judgments before the district court proceedings commenced* and inviting district court review and rejection of those judgments" (emphasis added)); *see also Efron v. Candelario*, 110 F.4th 1229, 1235 (11th Cir. 2024) ("[A] party losing in state court is barred from seeking what in substance would be appellate review of the state court judgment in a United States District Court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994))); *Nicholson v. Shafe*, 558 F.3d 1266, 1279 (11th Cir. 2009) (holding that the *Rooker-Feldman* doctrine did not apply where "an appeal from the state court judgment remains pending at the time the plaintiff commences the federal court action").

---

[5] While the Court does not consider the evidence presented at the preliminary injunction hearing in ruling on the Defendants' motion to dismiss, the Court notes that there was virtually no mention by any party of Ivey and only limited mention of Marshall in the context of his office's involvement in drafting the nitrogen hypoxia protocol.

[6] Due to Grayson's failure to establish standing as to Marshall and Ivey, the Court declines to address their immunity or other arguments.

Likewise, neither res judicata nor claim or issue preclusion applies here because the sole question before the Alabama Supreme Court when Marshall moved the Alabama Supreme Court for permission to carry out Grayson's execution was whether *now* was the "appropriate time" to execute Grayson.[7]   Ala. R. App. P. 8(d)(1).   True, Grayson raised his Eighth Amendment argument with the Alabama Supreme Court in opposition to Marshall's request, but the pertinent question before the state court was not whether the method of execution would inflict an unconstitutional level of pain but instead was whether *now* was the appropriate time to conduct the execution.   The Alabama Supreme Court made no finding on the Eighth Amendment issue.   That court's task, again, was to decide, under the circumstances, if *now* was an appropriate time to execute Grayson.[8]   The Alabama

---

[7] "A claim is barred by res judicata, *i.e.*, claim preclusion, when '(1) there is a final judgment on the merits; (2) the decision was rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, are identical in both suits; and (4) the same cause of action is involved in both cases." *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 30 F.4th 1079, 1083 (11th Cir. 2022) (quoting *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999)).   Similarly, issue preclusion or "[c]ollateral estoppel . . . forecloses relitigation of an issue of fact or law" if four elements are met:

> (1) [T]he issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.

*CSX Transp. Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003) (quoting *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986)).

[8] The Court notes that the same analysis can be applied to reject application of the *Rooker-Feldman* doctrine.

21

Supreme Court decided that it is.  Accordingly, res judicata and claim and issue preclusion have no application here.

### 2.     Hamm and Raybon's Merits-Based Arguments

For clarity, the constitutionality of capital punishment is *not* before the Court. The death penalty is constitutional, and it is in force in Alabama.  The unenviable task falls to this Court once again (for the third time) to decide whether execution by nitrogen hypoxia under the current protocol violates the Eighth Amendment; this time for Grayson's stated reasons.  Of note, in *Smith v. Hamm*, No. 23-cv-656, 2024 WL 116303, at *21 (M.D. Ala. Jan. 10, 2024), this Court previously rejected an assertion that it was substantially likely that the ADOC's nitrogen hypoxia protocol violated the Eighth Amendment.[9]  The Eleventh Circuit subsequently affirmed that decision.  *Smith v. Comm'r, Ala. Dep't of Corr.*, No. 24-10095, 2024 WL 266027, at *1 (11th Cir. Jan. 24, 2024).

Like in *Smith*, to state a plausible method-of-execution claim, Grayson must (1) show that the challenged method "presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and gives rise to 'sufficiently *imminent* dangers'"; and (2) identify "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason."  *Price*, 920 F.3d at 1325–26 (quoting *Glossip v. Gross*, 576 U.S. 863, 877 (2015), and *Bucklew*, 587 U.S. at 134).  The Eleventh Circuit interpreted the Supreme Court's method-of-execution framework as requiring a showing of "a substantial risk of serious harm,

---

[9] The parties settled the *Miller* case before the Court ruled on Miller's challenge to the nitrogen hypoxia protocol.

an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Id.* at 1326 (internal quotation marks and brackets omitted) (quoting *Glossip*, 576 U.S. at 877). Deciding "whether the State has cruelly 'superadded' pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by 'compar[ing]' that method with a viable alternative." *Bucklew*, 587 U.S. at 136 (alterations in original) (quoting *Glossip*, 576 U.S. at 876–80). The "comparison 'provides the needed metric' to measure whether the State is lawfully carrying out an execution or inflicting 'gratuitous' pain." *Id.* (citation omitted).

In their motion to dismiss, Defendants[10] Hamm and Raybon raise four arguments. First, they contend Grayson should be estopped from advancing his second proposed alternative — sequential, intramuscular injections of ketamine and fentanyl — because Grayson previously "argued that execution by nitrogen hypoxia using a mask would be constitutional." (Doc. 52 at 26.) Second, they argue that the proposed fentanyl protocol is barred by the statute of limitations because Grayson "was initially subject to lethal injection," failed to propose an alternative drug, "and then became subject to nitrogen hypoxia . . . all over two years ago (beyond the limitations period)." (*Id.* at 26.) Third, they argue Grayson's second proposed alternative involving the use of fentanyl is barred by the Prison Litigation Reform Act (PLRA). (*Id.* at 27.) And fourth, they generally contest Grayson's ability to plead an Eighth Amendment claim.

---

[10] Since Marshall and Ivey are being dismissed for other reasons, the Eighth Amendment claims will be considered only against Hamm and Raybon, although the issues essentially would be the same as to them if considered.

23

### a.   Estoppel

As to Hamm and Raybon's estoppel assertion, Grayson contends that he "reserved the right to challenge the then-unwritten protocol" when he elected execution by nitrogen hypoxia in "a form adopted by Defendants Hamm and Raybon," which he argues means that "Defendants Hamm, Raybon, and Marshall should be bound by its terms and estopped from arguing estoppel." (*Id.*)

The "equitable doctrine of . . . estoppel is intended to 'prevent the perversion of the judicial process' and 'protect its integrity by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc) (cleaned up) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)).  "When a party does so, the doctrine of . . . estoppel allows a court to exercise its discretion to dismiss the party's claims." *Id.*  To determine its application, courts look to "whether (1) the party took an inconsistent position under oath in a separate proceeding, and [whether] (2) these inconsistent positions were 'calculated to make a mockery of the judicial system.'"  *Id.* at 1181 (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)).  The Court must consider Grayson's actions and motive and determine whether his current claims result from "cold manipulation" and not "inadvertence[] or mistake." *Id.* (alteration in original) (quoting *Johnson Serv. Co. v. Transamerica Ins.*, 485 F.2d 164, 175 (5th Cir. 1973)).

Grayson elected execution by nitrogen hypoxia during litigation that was filed shortly after he was notified that the State of Alabama was seeking a death warrant, which would be conducted via lethal injection.  In that litigation, Grayson claimed that nitrogen hypoxia via a mask with a sedative was a feasible alternative compared to lethal injection.  In his current litigation, Grayson now seeks (1) an order

24

prohibiting Hamm and Raybon from executing him using any method other than one of his proposed alternatives, (2) an order declaring the ADOC's current nitrogen hypoxia protocol unconstitutional, and (3) an order enjoining Hamm and Raybon from executing him using the current protocol.

Here, Grayson does not challenge nitrogen hypoxia via a mask as an unconstitutional method of execution per se. Rather, he challenges certain aspects of the current nitrogen hypoxia protocol, such as an execution via nitrogen hypoxia with a respirator mask absent a sedative. When Grayson elected execution by nitrogen hypoxia in his previous litigation, the current nitrogen hypoxia protocol did not exist. And when he signed the nitrogen hypoxia opt-in form, he expressly reserved the right to challenge the constitutionality of any subsequently issued nitrogen hypoxia protocol. It was not until nearly five years later in August 2023 that the ADOC disclosed the current protocol.

Death-row inmates regularly pursue capital litigation in federal courts hoping to indefinitely delay their execution; Hamm and Raybon repeatedly emphasize that in their briefs. In his deposition, Grayson admitted that his litigation tactics are more about delay than in addressing true constitutional concerns about the execution process, as he stated there was a "plan . . . to cost as much money, make it as easy as it can be done, as expensive as it can be done, and as shockingly as it could be done." (Doc. 84-53 at 75.) That admission aside, the current nitrogen hypoxia protocol did not exist, nor was he subject to it during his previous litigation or agree to it. As a result, Grayson was unable to fully and fairly litigate at that time an Eighth Amendment challenge to it, and Hamm and Raybon have not shown that estoppel has application here under Grayson's current allegations.

### b.    Statute of Limitations

Largely for the same reason that Hamm and Raybon's estoppel argument fails – the ADOC's nitrogen hypoxia protocol was not released until August 2023 – so too does their statute of limitations argument.

Eighth Amendment jurisprudence holds that a condemned inmate has a new "method of execution claim [that] accrues on the later of the date on which state review [of his conviction and sentence] is complete, or the date on which the capital litigant becomes subject to a new or substantially changed execution protocol." *Boyd v. Warden*, *Holman Corr. Facility*, 856 F.3d 853, 873 (11th Cir. 2017) (quoting *McNair v. Allen*, 515 F.3d 1168, 1174 (11th Cir. 2008)).  The Eleventh Circuit has recognized that condemned inmates must be allowed an opportunity to challenge new and substantially changed execution protocols.  *Id.* at 873.

Grayson's claims here did not accrue until the ADOC announced in August 2023 its new nitrogen hypoxia protocol.  *See Boyd*, 856 F.3d at 873.  As such, any claim based on that protocol, especially as it concerns the use or lack of a sedative or any of the more nuanced issues, is not time-barred.

### c.    PLRA Exhaustion

As for Hamm and Raybon's argument that the PLRA bars Grayson's second proposed alternative (the fatal dose of fentanyl), they have not satisfactorily developed the argument.  In fact, they devote only two paragraphs to it, and the argument is somewhat difficult to follow.  (*See* doc. 52 at 26–27.)  It is not the Court's obligation to advance arguments on behalf of the parties, or to conduct the research for them.  "[T]he onus is upon the parties to formulate arguments." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *see Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1149 (11th Cir. 2017) ("It is not our job,

26

especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief." (quoting *Yeomalakis v. FDIC*, 562 F.3d 56, 61 (1st Cir. 2009))).  As such, the Court declines Hamm and Raybon's invitation to dismiss Grayson's second proposed alternative as barred by the PLRA.

### d.   Grayson's Pleading of an Eighth Amendment Violation in Count One

Hamm and Raybon next argue that, for a variety of reasons, Count One of the Amended Complaint — that the protocol superadds pain because of the lack of sedation and an alleged improperly fitted mask which result in suffocation while conscious — should be dismissed for failure to state a claim.[11]  Hamm and Raybon contend that Grayson does not plausibly allege a substantial risk of severe pain or superadded pain or a feasible and readily implemented alternative method that would significantly reduce a substantial risk of severe pain; that the Amended Complaint amounts to a shotgun pleading and is contradictory; that *Baze* does not hold that any amount or risk of suffocation while conscious is per se unconstitutional; and that they have a valid penological justification for refusing to adopt Grayson's proposed alternatives because, for among other reasons, the proposed last minute alternatives have not been adopted by another state and there is no study that shows the alternatives to be effective.

---

[11] Relying upon Justice Thomas' concurrence in *Bucklew*, 587 U.S. at 151–52 (Thomas, J., concurring), Hamm and Raybon argue that "Grayson's claims should fail because he does not allege that the method was *designed* to superadd pain." This consideration has not been formally embraced in any binding Eighth Amendment law in this Circuit.  But if such a consideration was required, Grayson's Eighth Amendment claim undoubtedly would have a problem since, at the preliminary injunction hearing, Grayson's counsel acknowledged that the nitrogen hypoxia protocol was not deliberately designed to inflict pain.

27

In contrast, Grayson asserts that he has stated claims for which relief can be granted because he alleges sufficient facts to plead a method-of-execution claim.  He contends that he alleges risks under the current protocol including but not limited to "an unacceptable risk of conscious suffocation." (*Id.* at 14.)  Grayson argues that he alleges alternatives that are feasible and readily implemented.   As for the language in *Baze* that Hamm and Raybon rely on, Grayson asserts that "substantial, constitutionally unacceptable risk' . . . modifies both 'suffocation' and 'pain,'" and, therefore, "[c]onscious suffocation is an unconstitutional method of execution." (*Id.*)

Again, to state a plausible method-of-execution claim, Grayson must (1) show that the challenged method "presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and gives rise to 'sufficiently *imminent* dangers'"; and (2) identify "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason."   *Price*, 920 F.3d at 1325–26 (quoting *Glossip*, 576 U.S. at 877 and *Bucklew*, 587 U.S. at 134).

Grayson's burden under this legal test can be "overstated," so the Supreme Court has clarified that a condemned person "seeking to identify an alternative method of execution is not limited to choosing among those presently authorized by a particular State's law."  *Bucklew*, 587 U.S. at 139–40.  At any rate, Grayson faces an exceedingly high bar because the Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual, and perhaps, understandably so. Far from seeking to superadd terror, pain, or disgrace to their executions, the States have often sought more nearly the opposite," *id.* at 133;  that is, "more humane way[s] to carry out death sentences." *Glossip*, 576 U.S. at 868.

28

Here, Grayson advances two primary imminent dangers associated with the current protocol in Count One.  First, according to the Amended Complaint, there is "no provision for pre-nitrogen sedation," which is a problem because of the "risk of agony associated with the conscious deprivation of oxygen under the Protocol," and the risk of an improperly fitted mask that would allow ambient air to enter Grayson's mask, thereby prolonging the execution process and increasing the mental and physical experience of suffocation.  (Doc. 42 at 15–17.)  The Amended Complaint further alleges two alternative methods that Grayson claims are feasible and will reduce the risk of an Eighth Amendment violation including (1) an alternative nitrogen gas protocol that incorporates the use of a sedative and (2) a sequential, intramuscular injection of ketamine followed by a fatal dose of fentanyl.

Taking Grayson's allegations as true at this stage of the litigation, as the Court must do, Grayson sufficiently alleges facts beyond "a formulaic recitation of the elements of a cause of action," and his allegations have a sufficient basis in fact "to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Grayson pleads that "[t]he Protocol creates a substantial risk of unconstitutional pain during an execution" in that he will not be sedated while being deprived of oxygen and that he must use an improperly fitted mask, thus resulting in imminent danger and superadded pain.  (Doc. 42 at 15–17.)  Grayson also alleges two alternatives that he claims will reduce that risk of harm.  Together, the dangers alleged, as compared to the alternative proposed methods of execution, amount to "a 'substantial risk of serious harm'—severe pain over and above death itself."[12]  *Nance v. Ward*, 597 U.S.

---

[12] To the extent that the parties disagree as to whether conscious suffocation is constitutional under *Baze*, at the motion to dismiss stage, the Court must consider whether Grayson's Amended Complaint states a claim to relief that is plausible on its face.  And here, it does.  The Court notes

159, 164 (2002) (*Nance II*) (quoting *Glossip*, 576 U.S. at 877).   Consequently, Grayson has sufficiently plead a plausible Eighth Amendment claim, *cf. Smith v. Comm'r, Alabama Dep't of Corr.*, No. 22-13781, 2022 WL 17069492 (11th Cir. Nov. 17, 2022), *cert. denied sub nom. Hamm v. Smith*, 143 S. Ct. 1188 (2023), and Hamm and Raybon's motion to dismiss Count One will be denied.

### e.   Substantial Risk of Hypoxia-Induced Injury (Count Two)

As an initial matter, the Court will interpret Count Two as an Eighth Amendment claim based on the potential for a botched execution attempt whereby Grayson would survive the execution attempt but suffer from a hypoxia-induced brain injury.  (Doc. 42 at 18.)  While the heading for Count Two makes no explicit mention of the Eighth Amendment, Grayson alleges, in part, that there is a substantial risk of a hypoxia-induced injury because of an airway obstruction that would leave him alive, but in a hypoxia-injured state.  This, according to Grayson, would violate the Eighth Amendment.

Hamm and Raybon argue that Count Two fails to state an independent Eighth Amendment claim and therefore should be dismissed.  They also contend that Grayson's allegations about an upper airway obstruction causing a prolonged execution process are conclusory and unsupported by any allegation that Grayson actually suffers from an upper airway obstruction or condition; that Grayson's allegations about a time-based criterion for the nitrogen gas fails to allege that it exposes him to any risk of harm; and that Grayson's allegations concerning false readings or failing EKG or oximeter devices are speculative and void of detail.

---

that in *Baze*, the petitioners challenged an entirely different method of execution—lethal injection—than the one at issue here.  *Baze*, 553 U.S. at 40.

As to this count, Grayson alleges that the protocol fails to provide for a medical examination before execution to identify any upper airway obstruction concerns that would cause a prolonged execution. He also alleges that the protocol does not provide appropriate safeguards including the monitoring of the pulse oximeter and EKG devices by competent medical personnel as the execution progresses, which could lead to prematurely stopping the flow of nitrogen while Grayson is still alive thereby leaving him with a permanent brain injury. Grayson further presents two alternative protocols that he alleges are feasible and that would reduce these occurrences.

Grayson's allegations must be accepted as true, no matter how unlikely they are.[13] They only need be plausible. Grayson alleges facts beyond a formulaic recitation of the elements of a cause of action, and his allegations have a sufficient basis in fact to raise a right to relief above the speculative level. Again, he pleads that the protocol creates a substantial risk of hypoxia-induced injury in violation of the Eighth Amendment in that it does not provide for a pre-execution medical examination to evaluate for upper airway obstruction issues nor monitoring of the pulse oximeter and EKG devices by competent personnel; such dangers thus create imminent danger and superadded pain in the form of a hypoxia-induced brain injury should Grayson survive. Grayson also alleges two alternative protocols that he claims will reduce that risk of harm. Together, the dangers alleged as compared to the alternative proposed methods of execution amount to "a 'substantial risk of serious harm'— severe pain over and above death itself." *Nance*, 597 U.S. at 164 (quoting *Glossip*, 576 U.S. at 877). Consequently, Grayson pleads a plausible

---

[13] Hamm and Raybon's arguments are better suited for consideration at the preliminary injunction stage where they can be factually tested.

Eighth Amendment claim as to Count Two, and therefore, Hamm and Raybon's motion to dismiss Count Two will be denied.

**B.    Grayson's Motion for Preliminary Injunction**

**1.    Burden**

When ruling on a preliminary injunction, all of the well-pleaded allegations in a movant's complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true. *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976). "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

And crucially, "where facts are *bitterly* contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998) (emphasis added). At an evidentiary hearing, the district court sits as both factfinder and credibility assessor. *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003). Highly disputed factual issues may cast doubt on the plaintiff's substantial likelihood of success. Ultimately, "[t]he grant or denial of a preliminary injunction is a decision within the sound discretion of the district court." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (citing *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 332 (5th Cir.1981)).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  Grayson is entitled to a preliminary injunction if he demonstrates (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the injunction; (3) that the threatened injury to him outweighs the harm the injunction would cause the Defendants; and (4) that "the injunction . . . would not be adverse to the public interest. *Barber v. Governor of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023).  A preliminary injunction is "not to be granted unless the movant clearly established the 'burden of persuasion' for each prong of the analysis." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)).  Grayson, as the movant, must satisfy his burden on all four elements "by a clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2948, 129–130 (2d ed. 1995)).

Substantial likelihood of success on the merits is "the most critical" factor in the preliminary injunction analysis, and because the Court concludes that Grayson has failed to meet his burden on this factor, "'it is unnecessary' for the [C]ourt to determine whether [Grayson] 'satisfied the second, third, or fourth factors.'" *Barber*, 73 F.4th at 1317 (quoting *Grayson v. Warden, Comm'r, Ala.*, 869 F.3d 1204, 1238 n.89 (11th Cir. 2017)).  Although Grayson plausibly alleges Eighth Amendment claims such that they survive dismissal at the motion to dismiss stage, he fails to show a substantial likelihood of success on their merits.  Accordingly, Grayson's motion for preliminary injunction will be denied.

### 2.    Grayson's Claims

In his preliminary injunction motion, Grayson requests the Court issue "an order to enjoin[] his execution until Defendants adopt a feasible and available alternative from [his] Amended Complaint, or if they refuse, until this litigation is complete."  (Doc. 30 at 3.)  Grayson argues the nitrogen hypoxia protocol violates the Eighth Amendment because it creates an unnecessary risk of superadded pain through conscious suffocation and survivable hypoxia-induced injury.  He contends he has a substantial likelihood of success on the merits because the protocol fails to provide for basic safety measures, such as a pre-execution medical examination, sedation, and device monitoring and mask fitting by qualified medical professionals. As to irreparable harm, Grayson asserts that he will suffer irreparable harm if the execution proceeds because he "will be executed in violation of the Eighth Amendment and his suit will be moot."  (*Id.* at 18.)  As for public interest, Grayson contends that "[t]he public has an interest in the full airing of information about the method of execution the Defendants intend to use in Alabama and export to the rest of the country," and relies, in part, on the Court's previous decision to release information in Smith's prior litigation "to facilitate public access to public records." (*Id.*)[14]   To reduce the alleged risk of substantial harm, Grayson proposes two allegedly feasible and readily implemented alternative methods of execution: (1) an

---

[14] Grayson fails to specifically address whether the threatened harm he will suffer from being executed under the protocol outweighs the harm an injunction would cause Hamm and Raybon. Instead, he argues that the balance of equities favors him because any delay in requesting an injunction is attributable to these Defendants.  He contends that Hamm and Raybon withheld the unredacted Protocol, prevented access to the equipment qualifications of the people using it, and prevented release of Smith's autopsy for six months.

alternative nitrogen gas protocol[15] that includes sedation of the inmate and (2) sequential, intramuscular injection of ketamine followed by a fatal dose of fentanyl. (Doc. 42 at 12–13.)

### 3.    Grayson's Primary Evidence and Argument

In support of his motion, Grayson primarily relies upon the testimony of Dr. McAlary, his anesthesiologist expert, who states that "there is an almost certain risk of agony due to the conscious deprivation of oxygen that will occur under the Protocol"[16] based, in part, on identified risks including the lack of a medical

---

[15] Grayson proposes the following changes to the protocol:

(1) A medical exam conducted by a competent physician before execution that determines whether the inmate suffers from upper airway obstruction issues and anxiety disorders and that "include[s] a mask fitting according to the manufacturer's instructions."

(2) "Following the final statement, the prisoner will receive an oral dose of midazolam in a 10 mg/kg [*now 0.2 mg/kg*] weight dose."

(3) "During a 10-minute wait, the execution team shall connect all monitoring equipment, including a pulse oximeter and EKG leads, which equipment shall be monitored throughout the process."

(4) "After the 10-minute wait, the prisoner will be given an intramuscular injection of ketamine in a 4 mg/kg weight dose."

(5) "Following an additional 10-minute wait, a member of the execution team will conduct a consciousness check . . . . [Which] shall be identical to the consciousness check employed in ADOC's lethal injection protocol."

(6) A second dose of ketamine if the inmate remains conscious after the first dose followed by a medical assessment if still conscious after the second dose.

(7) If the execution team "is satisfied the prisoner is unconscious, the execution team will place the mask securely on the prisoner. [And o]nce the mask is secure, the execution team will start the [allegedly sufficient] flow of [five liters per minute] nitrogen into the mask."

(8) "The execution team should observe the EKG monitor" and verify the EKG leads as working correctly once the inmate is dead.

(9) And once pronounced dead, "the nitrogen flow should be turned off. [And a]fter a 60 second wait, the mask can be removed, and the prisoner can be removed from the facility."

(Doc. 42 at 12–13.)

[16] Dr. McAlary acknowledged during the preliminary injunction hearing that there is no physical pain associated with the nitrogen hypoxia protocol, only psychological pain.

35

examination and sedation[17] prior to execution and the use of correctional officers without medical or scientific training "to monitor the flow of nitrogen gas into the mask." (Doc. 30-9 at 3–4, 7.) Dr. McAlary points to the autopsy report of Kenneth Smith, who was the first person to be executed by nitrogen hypoxia, and the medical examiner's finding at autopsy that Smith suffered from "pulmonary congestion and edema." According to Dr. McAlary, this finding is highly concerning because it shows that "Smith's lungs were filled with fluid and blood at the time of his death," (*id.* at 2–4), and was therefore indicative of conscious suffocation that he attributes to negative pressure pulmonary edema. Dr. McAlary also expressed concern with the lack of a pre-execution medical examination and sedation because the lack of a medical examination "raises serious concerns about adding physical pain and emotional duress to the process," and the lack of sedation "raises the risks of significant psychological pain" including that from panic and anxiety disorders and shifting and displacement of the mask which could prolong the execution process due to the introduction of ambient air. (*Id.* at 4.)

Dr. McAlary also criticizes the protocol's failure to require the ADOC to use medical or scientific professionals to monitor the flow of nitrogen gas into the mask which he believes would significantly reduce the risk that the nitrogen gas flow rate is set incorrectly or is prematurely turned off. Similarly, Dr. McAlary has concerns about ADOC correctional officials placing and monitoring the execution equipment,

---

[17] In his motion, Grayson argues that "the lack of sedation . . . violates *Baze*'s prohibition on conscious suffocation." (Doc. 30 at 14.) But conscious suffocation as mentioned in *Baze* is discussed in the lethal injection context—specifically Kentucky's lethal injection protocol—and is thus inapplicable to the present case. *Baze*, 553 U.S. at 41, 53. Further, nothing in *Baze* holds that the per se existence of conscious suffocation automatically disqualifies an execution method as being unconstitutional.

including the mask, leads, EKG, pulse oximeters, and nitrogen gas delivery system, such that they may not properly secure, monitor, or interpret the equipment correctly.

And finally, according to Dr. McAlary, the protocol's time-based criterion for cessation of the nitrogen gas "invites the risk of causing significant brain and heart injury without death." (*Id.* at 8–9.)  In other words, Dr. McAlary believes the time-based criterion creates a risk that the nitrogen gas will be turned off prematurely, thereby leaving the inmate in a living, but brain-damaged state.

At the preliminary injunction hearing, Dr. McAlary primarily focused his testimony on the risk of "negative pressure pulmonary edema" attached to "conscious suffocation." The basis for this opinion stemmed largely from the medical examiner's observation of "pulmonary edema" in Kenneth Smith's autopsy. Smith was the first person to ever be executed under the ADOC's nitrogen hypoxia protocol.  Although the Smith autopsy report made findings of "pulmonary edema," Dr. McAlary extrapolated from that finding that the edema was due to an upper airway obstruction that caused negative pressure which in turn led to pulmonary edema, all while Smith was in a conscious state.  He further relied upon news article accounts from various eyewitnesses to the Smith execution during which many of the witnesses noted Smith's struggle, body movements, and breathing.  Despite his opinion about the cause of Smith's pulmonary edema, Dr. McAlary acknowledged that Smith's medical examiner, Dr. Shante Hill, did not find any obstruction of Smith's airway at autopsy and did not attribute the pulmonary edema to an upper airway obstruction or negative pressure.  And Dr. McAlary offered no case studies or articles supporting his opinions.

4.      **Hamm and Raybon's Primary Evidence and Arguments**

Hamm and Raybon primarily rely on the medical testimony of Dr. Antognini, their expert anesthesiologist.  In his declaration testimony and at the hearing, Dr. Antognini contested Dr. McAlary's opinions.  In his declaration, Dr. Antognini stated among other things that nothing in the Alabama protocol or the nitrogen hypoxia system would lead to the inmate suffering pain, aside from the pain associated with the inmate struggling while being moved to the execution chamber and being secured to the gurney and any attempts by the inmate to remove the mask or violently shake his head.  As for the eyewitness observations during the Smith execution, Dr. Antognini stated that the various movements described by eyewitnesses could be related to Smith's own actions in resisting and in his consumption of an illegal drug before his execution.[18]  With respect to Dr. McAlary's opinion that medical professionals should participate in an execution, Dr. Antognini stated that "the American Medical Association's Ethics Opinion 9.7.3 prohibits the participation of physicians in executions."  (Doc. 84-11 at 20–21.)

In his declaration, Dr. Antognini also disputed Dr. McAlary's opinion that Smith's pulmonary edema as noted at autopsy "was due to negative pressure pulmonary edema . . . and . . . nitrogen causing upper airway obstruction." He elaborated that Dr. McAlary offered "no evidence or references that nitrogen hypoxia . . . would cause upper airway obstruction."  (*Id.* at 21.)  He also stated that "[p]ulmonary edema at autopsy is common and is a non-specific finding in a variety of causes of death" and that "the presence of pulmonary edema found at autopsy of . . . Smith is not indicative of any specific process."  (Doc. 84-11 at 22 (citation

---

[18] Smith's autopsy report noted synthetic cannabinoids in his system.

omitted).)   In his opinion, Dr. McAlary failed to account for "other possible contributory mechanisms to pulmonary edema, including a neurogenic (brain) cause and pulmonary vasoconstriction" and that "[t]here is no evidence that pulmonary edema occurred in . . . Smith while he was conscious."  (*Id.* at 22–23 (citations omitted).)

Concerning a pre-execution medical examination, Dr. Antognini testified in his declaration that such an examination is unnecessary because a person who is at risk for an upper airway obstruction would become hypoxic faster than a person with normal airway anatomy and would therefore become unconscious faster after the flow of nitrogen gas begins.  He further testified that the time period during which nitrogen gas will be administered under the protocol is reasonable because "it is highly unlikely that a person who has had asystole in the setting of nitrogen hypoxia and in the absence of resuscitation, would have spontaneous recovery of cardiac activity."  (Doc. 84-11 at 22.)

Addressing Grayson's proposed alternative methods of execution, Dr. Antognini stated that they are not feasible for various reasons, including drug availability, drug synthesis, and route of administration (intramuscular, with risk of prolonged drug action), which could cause depressed respiration, airway obstruction, nausea, and brain damage if the inmate survived.

During his live testimony at the hearing, Dr. Antognini expressed similar opinions.  He testified to his disagreement with Dr. McAlary about negative pressure pulmonary edema and repeatedly noted that pulmonary edema is a regular nonspecific finding in autopsies and that there is no evidence that an obstruction occurred with Kenneth Smith.

Aside from the testimony from Dr. Antognini, from a medical standpoint, Hamm and Raybon offered several case studies and articles that discussed asphyxiation due to inert gas inhalation in the setting of industrial accidents, suicides, airdrops, and epilepsy. Of significance, those studies and articles acknowledged the existence of pulmonary edema in asphyxia-related deaths due to inert gases, but did not note, opine, or discuss negative pressure caused by an upper airway obstruction as being a cause or contributor.  In other words, these articles did not support Dr. McAlary's opinions about nitrogen gas hypoxia causing negative pressure pulmonary edema, especially when the individual was in a conscious state. They suggest that pulmonary edema is an expected observation at autopsy, even for individuals who committed suicide.

Hamm and Raybon also argue that Grayson has not offered any supporting evidence of constitutionally significant pain associated with inert gas asphyxiation. And as for Dr. McAlary's opinion that "there is an almost certain risk of agony due to the conscious deprivation of oxygen that will occur under the Protocol," (doc. 30-9 at 3–4), they assert that Dr. McAlary offers no evidence in support of his opinion— "no documents, studies, or other reliable data."  (Doc. 58 at 12.)  With respect to Dr. McAlary's opinion that the lack of sedation before the inhalation of nitrogen "raises the risks of significant psychological pain," (doc. 30-9 at 4), they note that Dr. McAlary identifies no peer-reviewed study or any other basis to support his opinion.

And they further point out that Dr. McAlary ignores the autopsy report's references to "pulmonary edema, not negative pressure pulmonary edema." (*Id.* at 16 (citing doc. 30-13).)  Such a "distinction is important because Dr. McAlary must explain how he reached a diagnosis or finding of negative pressure pulmonary edema

simply from the medical examiner's finding of pulmonary edema." (*Id.* (emphasis omitted).)

Hamm and Raybon challenge Dr. McAlary's opinion that the failure to include a medical examination in advance of the execution would add pain and emotional duress to the execution process. They also challenge his opinion that, if someone has an upper airway obstruction, the execution process will be prolonged, thereby creating additional panic and fear and resulting in a painful process. As they note, despite making this claim, neither Grayson nor Dr. McAlary claim that Grayson suffers from any upper airway obstruction, let alone panic and anxiety that exceeds that normally expected in anticipation of a condemned inmate's impending execution.

As to Dr. McAlary's position that a sedative would alleviate these issues and reduce the risk of the mask shifting or medical device monitors becoming dislodged or nonfunctional, Hamm and Raybon argue that such allegations are speculative, amount to nothing more than mere possibilities, and do not "rise to the level of an Eighth Amendment concern." (Doc. 58 at 19–20.)

With respect to the psychological pain identified by Dr. McAlary, Hamm and Raybon assert that Dr. McAlary fails to explain "why the pain from nitrogen hypoxia is severe," (doc. 58 at 20), which, according to them, means that Dr. McAlary's opinion that panic will increase under the protocol is unsupported. They contend that Dr. McAlary "does not specifically discuss whether . . . Grayson's proposed nitrogen hypoxia alternative would 'significantly' reduce the amount of 'severe' psychological pain." (*Id.* at 21.) Addressing Grayson's allegation that device monitoring is performed by unqualified people, they respond that such an allegation is insufficient to show a substantial likelihood of success. Specifically, Grayson

41

presents no evidence that the EKG leads or pulse oximeters becoming dislodged or nonfunctional during an execution is sure or very likely to occur or that these occurrences would cause substantial pain.  Hamm and Raybon also contend that none of the risks associated with monitoring being performed by unqualified people are addressed by either of Grayson's proposed alternative methods or Dr. McAlary's declaration.

Turning to Dr. McAlary's criticism of the protocol's time-based criterion, including the requirement that nitrogen be given to the inmate through a mask for 15 minutes or until 5 minutes after the inmate shows a flatline on the EKG devices, whichever is longer, Hamm and Raybon argue that this criticism is not an identification of a risk that will result in harm or injury, as evidenced by Grayson's proposed nitrogen hypoxia alternative because the "alternative . . . calls for removing the inmate from a pure nitrogen environment as soon as a flatline occurs, following verification that the leads are properly attached."  (Doc. 58 at 24 (citing doc. 42 at 13).)

Hamm and Raybon also challenge Grayson's motion pursuant to Federal Rule of Civil Procedure 65(d)(1)(C) in that, by requesting an injunction, the motion does not describe in reasonable detail the acts required.  They contend that any order issued by this Court would require more than a directive to not execute Grayson; it would also require the ADOC to use one of his proposed alternatives, which is not possible because Grayson has not established that the suggested drugs are readily available or that willing and able medical professionals are available to administer them.  In addition, Hamm and Raybon advance the argument that the balance of equities weighs in their favor because Grayson delayed in filing his motion.  As to irreparable harm, they assert that Grayson would not necessarily satisfy the harm

42

factor even if he were likely to succeed.  As to the public interest, they maintain that "[t]he public has a strong interest in the execution of [Grayson]'s unchallenged criminal sentence."  (*Id.* at 29–30.)

In reply, Grayson argues that he pleads feasible and readily implemented alternatives because in his Amended Complaint he alleges, in part, that the person who provides midazolam to Hamm and the ADOC is a pharmacist or pharmacy, and ketamine and fentanyl are readily available in pharmacies throughout Alabama, just like the access the ADOC has for the drugs used in lethal injections.

### 5.   Discussion

Grayson has the burden to "establish a likelihood" that the nitrogen hypoxia protocol is unconstitutionally cruel because it will inflict an "unacceptable risk of severe pain" that is "substantial when compared to the known and available alternatives." *Glossip*, 576 U.S. at 867, 878.  He must show that the challenged method of execution creates "a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment," and additionally must point to "an alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Price*, 920 F.3d at 1326 (cleaned up) (quoting *Glossip*, 576 U.S. at 877).  In other words, Grayson must again satisfy the *Baze-Glossip* test, as interpreted in *Price*, but now he must bolster his allegations, which are highly contested by Hamm and Raybon, with evidence to meet his heavy burden.

Again, preliminary injunctions are extraordinary remedies meant to preserve the status quo until the merits of a case can be fully and fairly adjudicated.  They are the exception, not the rule.  So, it is Grayson's burden to show a substantial

43

likelihood that he will succeed on his claims before the Court enjoins his execution to allow him to litigate his challenge. And for good reason. The status quo here is that Grayson will be executed by nitrogen hypoxia on November 21, 2024, using the ADOC's current nitrogen hypoxia protocol. Courts presume, based on the history and development of capital punishment in this country and the legislative process, that Hamm and Raybon do not seek to superadd terror, pain, or disgrace to their executions unless a condemned person can make the requisite showing under *Baze* and *Glossip*. *Bucklew*, 587 U.S. at 133 (citing *Baze*, 553 U.S. at 52 and *Glossip*, 576 U.S. at 877). And counsel for Grayson's admissions at the hearing confirm the lack of intent by the State of Alabama, including Hamm and Raybon, to add pain, let alone superadded pain, in developing and implementing the nitrogen hypoxia protocol. [19]

Considering all the evidence presented, the credibility and weight of that evidence including the witnesses and supporting materials, and the parties' arguments, Grayson has not met that burden. His evidence and allegations amount to speculation, a speculative parade of highly unlikely events, and scientific controversy at best.[20] They fall well short of showing that the nitrogen hypoxia protocol creates an unacceptable risk of pain, let alone superadded pain. *Glossip*, 576 U.S. at 882, 884 (quoting *Baze*, 553 U.S. at 51). Grayson fails to establish that

---

[19] At the hearing, Grayson's counsel acknowledged that the nitrogen hypoxia protocol is more humane than execution by electrocution. Counsel waivered when asked to compare nitrogen hypoxia with lethal injection.

[20] For example, in *Smith*, Smith claimed that "the Protocol . . . subject[ed] him to a 'substantial risk of asphyxiation on his own vomit," *Smith*, 2024 WL 116303, at *17 (citation omitted), and his medical expert characterized that as an almost certainty. But that certainty never happened. Nor did it happen with the Miller execution.

the protocol "presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and gives rise to 'sufficiently *imminent* dangers.'" *Price*, 920 F.3d at 1325 (citations omitted).  And further, the evidence presents the classic battle of the experts, which does not rise to a substantial likelihood of success on the merits. *See Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1270–73 (11th Cir. 2014) (affirming the district court's denial of the plaintiff's motion for preliminary injunction where the district court determined the plaintiff's expert witness's testimony to be "essentially speculative and insufficient to meet [the plaintiff's] burden" (internal quotations omitted)).

Grayson primarily relies on the medical opinions and testimony of Dr. McAlary to support his preliminary injunction motion, including his proposed alternative methods of execution.  In its simplest, Dr. McAlary finds that there is an almost certain risk of agony due to the conscious deprivation of oxygen that will occur under the protocol due to the lack of a medical examination and sedation prior to execution and due to the use of correctional officers who lack medical or scientific training "to monitor the flow of nitrogen gas into the mask."  (Doc. 30-9 at 7.)  And although not really emphasized by Grayson at the hearing, Dr. McAlary also presents a risk that Grayson could be left with permanent brain damage should the nitrogen gas be turned off before he dies.  As for pain, Dr. McAlary conceded that the protocol only inflicts psychological pain, a type of pain that would exist regardless of the method of execution.

Hamm and Raybon vigorously contested Dr. McAlary's opinions through not only medical testimony from Dr. Antognini, but also numerous third-party articles and case studies.  As they note, Dr. McAlary provides no evidence other than his belief of the existence of negative pressure edema, which he extrapolates from the

45

Smith autopsy report[21] and inferences taken from hearsay eyewitness accounts of highly questionable value. And he provides no case studies or articles supporting his opinions, such as those provided by Hamm and Raybon which are supportive of Dr. Antognini's opinions.

Likewise, Dr. McAlary stated that the protocol's failure to include any form of sedation prior to the inhalation of nitrogen gas raises the risks of significant psychological pain. But he again provides no study or similar support. And those sedatives, as Dr. Antognini notes, also come with their own risks and side effects including nausea, respiratory depression, and agitation, which Grayson – and Smith in his litigation – raises as factors that complicate the ADOC's nitrogen hypoxia protocol. And Dr. McAlary's opinions focus, perhaps overly, on anxiety and panic, which is to be expected regardless of the method of execution. It is not just an issue with nitrogen hypoxia. Other courts have held that psychological pain or mental suffering cannot by itself support an Eighth Amendment claim. *In re Execution Ohio Execution Protocol Litigation*, 881 F.3d 447, 450 (6th Cir. 2018) (agreeing with the district court's assessment that "[p]sychological pain or mental suffering is a likely result of being sentenced to death and anticipating the execution, but that experience of psychological suffering could not by itself make a method of execution unconstitutional"). And of note on that issue, evidence was provided that Grayson could make a medical request for a sedative separate and apart from the execution protocol, and there is a strong possibility that such a request would be granted so long as the request is made for therapeutic purposes.

---

[21] Smith's autopsy report only indicates pulmonary edema, not negative pressure pulmonary edema. (Doc. 30-13 at 2.)

To the extent that Grayson relies on Kenneth Smith's actions during his execution to support his motion, the fact that Smith may have acted out or fought the restraints does not give rise to a constitutional concern either, at least under the record presented here.  And as the record shows, the evidence concerning what actually happened, or what eyewitnesses observed during the Smith execution, was conflicting and inconsistent (e.g., the eyewitness accounts were not identical and contradicted the timeline of actual events for when the nitrogen gas was turned on) and in some respects wrong (e.g., one witness said he thought he saw an IV line, which actually was an EKG lead cable).  But what that evidence did show was that the nitrogen hypoxia protocol was successful and resulted in death in less than 10 minutes and loss of consciousness in even less time.  As for the more recent Miller execution, evidence established that his execution was quick, unconsciousness reached in less than 2 minutes, was void of struggles against the restraints, and with minimal body movement as compared to the Smith execution.  Indeed, for as much as Smith's execution was painted in the violent manner that it was, Miller's execution was not.

Moreover, Grayson relies, in part, on alleged deficiencies with the mask and its fitting to argue that the use of this mask increases the likelihood of the introduction of oxygen which would prolong the execution process and possibly result in a hypoxia-induced injury.[22]  But little evidence was presented of this unsubstantiated assertion.  No evidence was presented about Grayson's facial

---

[22] The Court previously inspected the same mask and noted that it was "highly unlikely that the mask would dislodge or that the seal would be broken and outside air introduced if it is tightly secured on the condemned inmate's head in a positive pressure environment."  *Smith v. Hamm*, No. 23-cv-00656, 2024 WL 116303, at *20 (M.D. Ala. Jan. 10, 2024).  The Court makes the same finding here.

dimensions, the fitting of the mask, the circumstances in which it would become loose and why, the amount of ambient air infiltration that could prolong the execution, or how Grayson would survive the execution attempt in the context of the other aspects of the protocol such as the EKGs, consciousness checks, and death declaration; nor did Grayson propose an alternative mask that would work better or address his concerns. The evidence at the hearing showed that Kenneth Smith and Alan Miller became unconscious within minutes after the nitrogen gas started flowing, experienced agonal breathing after their loss of consciousness, and that Smith held his breath and struggled against the restraints while Miller did not. No competent or persuasive evidence was provided otherwise, nor was any competent evidence provided suggesting that there was a leak or loosening of the masks. As such, Grayson's loose-fitting mask concern bears no real consideration here.

Through Dr. McAlary, Grayson emphasizes the need for a pre-execution medical examination to assess the inmate for possible airway obstruction issues and other psychological conditions that could result in adding physical pain, panic, and fear. But again, these are highly speculative concerns that were largely unsupported at the hearing by any evidence specific to Grayson. For example, Grayson failed to show that he actually suffers from an airway obstruction condition or that he would suffer from any physical pain.

As for Grayson's medical monitoring argument, his apprehension again travels upon theoretical concerns placed on a parade of highly unlikely horribles. The protocol calls for two EKG machines and two pulse oximeters. Grayson claims there is a substantial risk of problems since nonmedical individuals will be placing the leads and monitoring the equipment, and there is a risk the devices will fail. But the protocol builds in redundancy, and these are not complex devices that require

highly trained medical professionals to use and interpret. After all, a medical professional is not needed to observe the decrease of a digital number from 98% to a number significantly lower—which is how a pulse oximeter indicates the desaturation of oxygen in the blood.[23] Nor is a medical professional needed to note that an EKG reading has flatlined, which is an indicator of cardiac cessation (i.e., death).[24] No competent evidence was provided showing that the execution team members are incapable of satisfactorily monitoring and interpreting these devices.

As for Grayson's alleged alternatives, which he made known only weeks ago,[25] there are real concerns as to whether they are feasible and readily implemented alternative methods. As for his sedative proposal, evidence was presented showing the difficulties in requiring a condemned inmate to orally ingest anything, let alone a sedative, in aid of an execution. Grayson presented no evidence showing where exactly he sought to obtain his proposed sedatives on a regular basis and who exactly would administer them. He vaguely referenced the availability of these sedatives in a pharmacy and the ADOC's ability to obtain certain drugs used during lethal injection executions, but even Grayson's own litigation history and contentions show that this is not an easy endeavor, let alone one that would be without vigorous legal challenges. Indeed, even Grayson's own expert announced at the hearing that he could not and would not compound these drugs or administer them. After all,

---

[23] Pulse oximeters can be purchased by anyone from their local pharmacy.

[24] The execution team is merely monitoring the EKG for a flatline, not, for example, whether there is a cardiac arrhythmia, which is a more complex interpretation that requires medical training.

[25] It is hard to show that the ADOC has refused to adopt a protocol without a legitimate penological reason when Grayson advanced these alternatives only a few weeks ago.

Grayson previously objected to midazolam.[26]  And in this case, he complains about the general qualifications of the execution team and proposes drugs that he does not want to be administered by people who he claims are incompetent to give them. And of course, Grayson's proposed alternative methods are neither tested nor used and are in direct contradiction of Grayson's own desires by proposing the use of midazolam.[27]

Grayson also provides no real analysis or consideration of the possible risks and side effects associated with using these sedatives in this matter.   For example, evidence was presented that midazolam bears noted side effects of respiratory depression, agitation, hyperactivity, and combativeness.  And ketamine has known side effects of respiratory depression, nausea, vomiting, and anaphylaxis.  Finally, with respect to fentanyl, which Grayson proposes to use as part of his fatal dosage protocol, known risks include respiratory depression, muscle rigidity, nausea, vomiting, laryngospasm, and anaphylaxis.  Simply put, use of these drugs creates their own issues of concern, especially midazolam and ketamine in the context of a nitrogen hypoxia execution where issues already exist according to Grayson with suppressed respiration, agitation, nausea, and combativeness.  But what his sedative-based nitrogen protocol does do, is add at least 20 minutes to the execution process, thereby prolonging the execution itself from a 5 to 10-minute proceeding to an almost 30-minute one.

---

[26] (*See* doc. 84-53 at 44 (Grayson stating that "I do not want midazolam.  Midazolam is a weak drug that tends to almost do what it wants to do and then decides, I don't want to do this no more, and leaves.  That's not – that's not a drug I want").)

[27] Grayson's second alternative relies upon the injection of a fatal dosage of fentanyl.  Grayson presents very little evidence about that alternative, instead placing his focus on his first alternative. As such, Grayson has not met his burden for the second alternative.

Grayson must also show "that the State has refused to adopt [his proposed alternatives] without a legitimate penological reason." *Price*, 920 F.3d at 1326 (quoting *Glossip*, 576 U.S. at 877, and *Bucklew*, 587 U.S. at 134). Grayson fails to show that his alternatives have been used or adopted by any other state or that they have a "track record of successful use." *Bucklew*, 587 U.S. at 142 ("[T]he State had a legitimate reason for declining to switch from its current method of execution as a matter of law. Rather than point to a proven alternative method, Mr. Bucklew sought the adoption of an entirely new method—one that had never been used to carry out an execution and had no track record of successful use." (internal quotation marks and citations omitted)). This is compared to the ADOC's nitrogen hypoxia protocol, which has been successfully used twice.

The evidence here presents the classic battle of the experts, and a battle where one expert (Dr. McAlary) has no supporting case studies or other supporting medical testimony while the other (Dr. Antognini) does. And when considering these medical experts and their opinions in the context of the evidence on which they rely, Grayson's expert finds himself without any real foundational support other than an unsupported opinion – no supporting articles or case studies, reliance upon highly questionable hearsay witness accounts, no support in Smith's autopsy report for an upper airway obstruction that led to negative pressure pulmonary edema, untested reliance on proposed alternatives with their own set of risks and complications, unfounded theories of risks of mask leaks or monitoring device failures, and unfounded theories that the execution team cannot adequately monitor pulse oximeter or EKG devices or make the simple interpretations intended from them. As such, the Court finds Dr. Antognini and his opinions on these subjects more credible and persuasive than those of Dr. McAlary. But what is generally

51

uncontested from the evidence is that the ADOC's nitrogen hypoxia protocol has been successfully used twice, and both times it resulted in a death within a matter of minutes.

On this record and given *Glossip*'s instruction, Grayson has not shown a substantial likelihood of success on his claims.  He has not sufficiently shown that the ADOC's nitrogen hypoxia protocol presents a risk that is sure or very likely to cause serious illness and needless suffering, and gives rise to sufficiently imminent dangers, nor has he sufficiently shown there exists a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the Defendants have refused to adopt without a legitimate penological reason.  The burden is on Grayson to meet the legal standard here, not Hamm or Raybon.  Because substantial likelihood of success on the merits is "the most critical" factor in this analysis, and Grayson has failed to meet his burden, "'it is unnecessary' for the court to determine whether [Grayson] 'satisfied the second, third, or fourth factors.'"  *Barber*, 73 F.4th at 1317 (quoting *Grayson*, 869 F.3d at 1238 n.89).  Both Grayson's motion for a preliminary injunction and request for a stay of execution will be denied.[28]

---

[28] The Defendants make repeated note of the gamesmanship employed by Grayson and his counsel by pointing to inconsistencies between Grayson's positions taken during his prior litigation and his position today, his deposition testimony about his plan to stall and delay, his attempts to disqualify the Alabama Attorney General's Office as legal counsel for the Defendants, and his designation of two of his attorneys as his "spiritual advisor" for his upcoming execution.  The Court also expresses these same gamesmanship concerns here as to Grayson and his counsel's actions.  But the Court also notes that the Defendants and their counsel have employed some gamesmanship of their own, and therefore, the Defendants are likewise without clean hands.

## V.  CONCLUSION

For these reasons, it is **ORDERED** that the Defendants' *Motion to Dismiss Amended Complaint* (doc. 52) is **GRANTED in part** and **DENIED in part**.  The motion is granted to the extent that Defendants Steven T. Marshall and Kay Ivey are dismissed from this action.  In all other respects, the motion is denied.  It is **FURTHER ORDERED** that Plaintiff Carey Dale Grayson's *Motion for Preliminary Injunction* (doc. 30) is **DENIED**.

DONE, on this the 6th day of November 2024.

_____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE