#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| CAREY DALE GRAYSON, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Case No.  2:24-cv-376-RAH |
| ) | |
| JOHN Q. HAMM, ) | |
| Commissioner, et al., ) | |
|     Defendants. ) | |

### REPLY IN SUPPORT OF FEE MOTION

On the eve of execution, Grayson's lawyers docketed an emergency motion that threatened the State's ability to carry out his sentence. The motion was premised on a false, incomplete, and misleading picture of events, but neither the Attorney General's Office nor the Court knew that at the time. As a result, Grayson's counsel forced Defendants and their counsel to work overnight, to coordinate and investigate, to begin briefing the issue for the Court, and to prepare for a conference in a matter of hours. Grayson's counsel also demanded the Court's attention, and they got it—understandably, given the motion's fevered pitch.

Without a doubt, Grayson's counsel wrongly "multiplie[d] the proceedings," 28 U.S.C. §1927, at the most sensitive time in the case. The response brief makes no attempt to defend the emergency motion on the merits. Thus, the only question is whether Grayson's counsel had proper reasons for filing it.

The answer is no: their conduct was unreasonable, and their motion was not brought in good faith. While counsel can generally "rel[y] on representations made by a client (and colleagues)," DE120:14, that excuse is unsatisfactory here. For one, the motion was so far detached from reality that it is hard to see it as a simple mistake or miscommunication. An offhand remark that misstates a fact is an accident; an emergency demand for injunctive relief chock-full of errors and omissions is not. For another, counsel's conduct cannot be explained by a pure motive to secure medical treatment. Keeton prompted Grayson to ask for *midazolam*—a drug that he did not want, he would not take, and the doctor would not prescribe. Grayson's counsel then waited *six hours* to contact Defendants and their counsel. The next morning, they withdrew the motion *to avoid a telephone call* with the Court. This is not how counsel would act if they truly thought "the motion was warranted," DE120-1:¶20, to redress an ongoing medical and constitutional emergency. *Cf.* DE105:1 n.1 ("[T]ime is of the essence…"). Their story doesn't add up, and the response brief raises more questions than it answers.

The emergency motion was not just "unpersuasive," DE120:17, nor the product of "mere negligence," *cf. Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003). Rather, Grayson's counsel "knowingly or recklessly pursue[d] a frivolous claim," which is enough for the Court to find objective bad faith, *id.*, and to award fees for the excess costs imposed by their misconduct.

I. **The Emergency Motion Was Frivolous.**

There's no sugarcoating it. The emergency motion centered on the allegation that Grayson's psychiatrist "made no medical assessment" during the telehealth appointment on November 20. DE105:2. That was wrong. As Dr. Edmonds explained: "I conducted a mental status examination of the patient, as is my custom during these appointments. Any allegation that I made no medical assessment is false." DE114-2:¶13.

Likewise, the emergency motion relied *passim* on Dr. Edmonds having told Grayson that it was just "too late" to request a sedative. DE105:2-3. That was also wrong. Dr. Edmonds gave several medical reasons against prescribing midazolam, including (1) that he "was unwilling to add another benzodiazepine to [the] regimen," as Grayson "was on such a high dose of Xanax already"; (2) that he had "never prescribed midazolam for psychiatric purposes" and did "not know of any psychiatrist who prescribes midazolam for general anxiety"; and (3) that Grayson's "Xanax dosage was at what would generally be considered the maximum." DE114-2:¶14. The doctor also "did not want to risk an adverse event, such as an overdose." *Id.* ¶15. In sum, midazolam "was not therapeutically warranted." *Id.* The patient agreed—"he did not want midazolam." *Id.* ¶14.

What part of the doctor's declaration, if any, Grayson's counsel "disputes" is unclear. DE120:13 n.18. Referring to the facts listed on page 1 of the fee motion,

3

they say, "These assertions are not accurate," without elaboration. DE120:13. But the Court should credit the doctor's highly plausible recounting. The evidence corroborating Dr. Edmonds's declaration includes his own notes about the visit, DE114-2:18-19, the account written by Nurse Andrews the following morning, DE108-1, her later declaration describing the events in detail, DE114-3, prison medical records suggesting a regular practice of assessing the patient's mental health at such appointments, DE114-1:23-41, and common sense: Why would YesCare have Grayson see a psychiatrist only to make no medical assessment and tell him it was too late for medical treatment? *Contra* DE105:1-2.[1]

All Grayson's counsel can do is nitpick Dr. Edmonds's declaration, noting that it was not dated and calling some of it hearsay, DE120:13, but they do not seriously contest the facts: Dr. Edmonds made a medical assessment and gave Grayson medical reasons against prescribing midazolam.

The motion was not just "unpersuasive," *id.* at 17; it was dead on arrival. Because Grayson had already received "a reasoned decision" from the psychiatrist, DE105:3, the motion rested on a false premise, and its request for relief was moot.

---

[1] Plus, the nurse's account of how Grayson spoke about midazolam fits perfectly with what he said at his deposition. *Compare* DE114-3:3 ("He…called it a 'shit drug.'") *with* Grayson Depo. 44:7-14 ("Midazolam is a weak drug…I don't want a half-assed drug."); *see also* DE114:4-6.

Grayson did not want or need another drug, let alone midazolam, so there was never any "injury" to redress, DE120:18, or judicial emergency to resolve.

Once it became clear that Defendants were ready to present these facts to the Court, Grayson's counsel withdrew the motion. Still, they refuse to admit today that the motion was frivolous, offering the implausible reason that they withdrew it only because "facts would be disputed." DE120:10. Would they? What exactly do Grayson's counsel dispute about the facts relayed by the nurse?

In truth, they withdrew the motion because its "potential of success," DE120-1:¶20, was nil. If the motion had legs, then the response brief could have tried to rehabilitate it on the merits. It did not. The response suggests only that there could have been some "likelihood of success" on a *different* motion demanding that "prison health officials [] provide a therapeutic sedative." *Id.*[2] But that's not the motion Grayson's counsel filed. The one they did file was objectively frivolous.

## II. The Emergency Motion Was Filed in Bad Faith.

If the Court agrees that Grayson's counsel pursued a "frivolous claim" or "needlessly obstruct[ed]" the proceedings, then the Court should decide whether

---

[2] Even if they had filed *that* motion, it would have failed, too. On the day of execution, the Court was not likely to assess the medical evidence, disagree with Dr. Edmonds, and order Defendants to procure and administer a sedative against the doctor's medical judgment. Neither the motion nor the response brief offers any legal or equitable ground for such an order. If the hypothetical motion had invoked the Eighth Amendment, the Court would have rejected it for the many reasons stated in its order denying the motion for preliminary injunction. *See* DE95:46.

they did so "knowingly or recklessly." *Schwartz*, 341 F.3d at 1225; *see Malautea v. Suzuki Motor Co., Ltd.*, 977 F.2d 1536, 1544-45 (11th Cir. 1993) ("[E]xamples of defense counsel's bad faith and willful abuse of the judicial process abound.").

The response boils down to one excuse: Grayson lied to his lawyers about what happened at the doctor's visit. They imply that he lied about what he told the doctor (or at least omitted it), and he lied about what the doctor told him. *See* DE120:14-15. And if Grayson lied to his lawyers, according to the response, then the emergency motion was reasonable. But Defendants have no qualm with the general principle that counsel can rely on clients for facts. The problem here is that there is serious reason to doubt Grayson's counsel's version of events.

**A.** Off the bat, the only evidence that Grayson lied is Keeton's say-so. But her account of what Grayson actually said remains elliptical and vague. She writes: "[Grayson] re-joined us on the visiting yard and indicated that the doctor had told him it was 'too late' to put him on something new." DE120-1:¶15. He *indicated*, but what did he *say*? To whom did he say it? Did he tell them that he had asked for midazolam? Did he say *anything else* about the doctor's visit over the next *six hours*? Did counsel ever ask him what else the doctor said? Did Grayson sign off on the emergency motion, premised as it was on the alleged lie?

Keeton's description of events sheds little light on what really happened. Maybe one of the other attorneys would corroborate her account; we don't know. All the Court has to support their story is that one sentence.

**B.** There is too much wrong with the emergency motion for its filing to be the product of mistake. Too much was hidden from Defendants and the Court. Aside from the demonstrable falsehoods in their motion, *supra* §I, Grayson's counsel also omitted material facts. If disclosed, the following information would have severely undercut the motion and led Defendants (and likely the Court) to doubt its central thesis:

- Since the evidentiary hearing, Grayson had switched medications, reported that Xanax was working for him, and declined his last two mental health appointments. *See* DE114-1:11-12, 20-22, 23, 24, 27; DE114-2:¶¶9-11.

- Grayson had tried to decline his November 20 mental health appointment before Keeton intervened. *See* DE114-3:2; DE120-1:¶13.

- Grayson took the November 20 appointment upon Keeton's urging. *See* DE114-1:19; DE114-2:¶14; DE114-3:2-3; DE120-1¶13.

- It was Keeton's idea to request midazolam at the appointment. *See* DE114-1:18-19; DE114-3:3; DE120-1:¶¶14, 20.

- Keeton authored Grayson's request to the doctor. *See* DE114-3:3; DE120-1:¶14.

- At the appointment, Grayson specifically requested a prescription for midazolam. *See* DE114-1:18-19; DE114-2:¶14; DE114-3:3.

Counsel painted a picture of Grayson alone "express[ing] severe and increasing anxiety and distress" and seeking a sedative, any sedative, which Dr. Edmonds callously refused "regardless of medical necessity." DE105:1-3. That picture was highly misleading, for Grayson had much less interest in any new drugs than the motion suggests, and he certainly had no interest in midazolam.

If not for Keeton, the whole episode would have been avoided, yet her pivotal role is nowhere to be found in the motion. Now that those facts are known, Keeton describes herself as a facilitator, merely asking Grayson "if he still wanted" a sedative and telling him that it was "the time for him to ask." DE120-1:¶13. But Grayson *already knew* that he could request mental health treatment at his mental health visits. *See, e.g.*, Grayson Depo. 50:16-19; *accord* DE114-1:29-30. Keeton was a catalyst for the alleged emergency, not a helpful bystander.

A reader of the emergency motion would be surprised to learn that Grayson was not dismayed by the doctor's denial. Instead, he "voice[d] understanding" and "agreement," DE114-1:18-19, and proceeded to laugh with his attorneys on the prison yard for hours, *id.* at 10. He seemed much more concerned about the prison WiFi than about receiving additional medical treatment. *See* DE120:1¶¶10-11, 16. These facts also cast doubt on the sincerity of the emergency motion.

**C.** That Grayson's lawyers told him to ask for midazolam and then filed an emergency motion that omits any mention of that drug strongly suggests that their

goal was to create a judicial emergency, not address a medical one. Not only is the drug rarely, if ever, prescribed for general anxiety, *see* DE114-2:¶14, but everyone in this case *knew* that Grayson did not want midazolam. He said so in his deposition (at 44:7-14), which became a focal point of the State's arguments on the motion to amend the complaint, DE81:3-4; 1 Tr. 7-8, on the feasibility of Grayson's first alternative, DE84:22, on the equities, DE84:29, and on appeal. It is not plausible that Keeton learned for the first time on November 20 that Grayson "did not want midazolam" and "would rather have" nothing. DE120-1:¶14.

So, why did she urge him to ask for it? All she says is that midazolam was "discussed at the hearing." *Id.* That fact does not make the drug more suitable for treating anxiety, but it might make for a more exciting emergency motion. After all, the Court specifically asked about the prospect of prescription midazolam at the hearing.[3] Perhaps counsel tried to *create* the facts that would most make it look like the Court had been misled. *Cf.* DE105:2-3 & n.2. In any event, the evidence suggests that the motive was not to secure any treatment that Grayson actually wanted. And

---

[3] The Court asked Deputy Commissioner Crook: "If Mr. Grayson was to desire midazolam…, could he make a medical request for it?" She answered: "He can talk to his physician or psychiatrist…as long as it's in response to a health issue." 1 Tr. 116-17. Providers "have medical autonomy," she continued, so any "medication would be between the physician and his patient." *Id.* at 117. In its order denying relief, the Court noted the "evidence…that Grayson could make a medical request for a sedative" and a "strong possibility that such a request would be granted so long as the request is made for therapeutic purposes." DE95:46.

9

the response brief lacks a credible explanation as to why midazolam was the drug of choice if it was not for litigation purposes.

**D.** If Grayson's counsel thought there was an ongoing medical emergency, their actions make little sense. They made no effort to communicate with Defendants, their employees, or their counsel about Grayson's medical request until the time they filed their motion. It would have been very easy to ask someone, anyone, "Did Dr. Edmonds really see Grayson for a mental health appointment, conduct no medical assessment, and tell him it was 'too late' for any treatment?" Nurse Andrews dispelled that fiction in a paragraph first thing in the morning.[4]

The problem here is not that Grayson's counsel "could have done more," DE120:19-20 n.24, or that counsel could have placed another call to ADOC, *id.* at 2, 19, 20. It's that numerous pieces of credible evidence strongly suggest that *they did not believe there was an emergency at all*. After all, counsel *did* call the prison before they filed their emergency motion. And what did they ask about? Not the controversy that purportedly required this Court's immediate attention. They asked about *Grayson's tablet*. DE120-1:¶16. The response brief spends five pages detailing the back-and-forth between counsel for Grayson and counsel for ADOC over

---

[4] If counsel thought that Grayson were suffering from "mania and some paranoia and delusions," DE120-1:¶4, then they would have had all the more reason to doubt his suspicious report about the doctor's visit. Their story then is that they filed based only on the word of their "not fully rational" client. *Id.* ¶17.

everything *but* Grayson's mental health. DE120:3-7. His lawyers were perfectly capable and comfortable communicating their concerns about note taking during Grayson's execution and the Wi-Fi in the death-watch cell. Yet for six hours, they said nothing about the purported emergency before running to court, claiming that "time [was] of the essence." DE105:1 n.1.[5]

Their actions the next day are equally perplexing if they thought there was an emergency. Keeton states that she wanted to withdraw the motion to avoid testifying and instead spend the day with Grayson. DE120-1:¶20. But at that point, the Court had ordered only a phone conference. And given that the motion was moot, *supra* §I, which the response brief seems to concede, there was little chance of an evidentiary hearing, let alone one that would require Keeton's presence in Montgomery. *Contra* DE120:10. If his counsel thought that Grayson needed a sedative, then they should have filed the second, threatened motion for preliminary injunction, DE105:3, but there's no indication they considered it, DE120-1:¶20. In all, counsel did not act like there was an emergency; their explanation for the

---

[5] The crux of the emergency motion was Grayson's visit with Dr. Edmonds where Grayson made the request and the request was denied. That was a little after 1:00 p.m. There was no reason for counsel to wait until after hearing back about Grayson's sick call request and no reason to believe the second request would be more successful. *Contra* DE120:19. Thus, it is not true that they acted "just over an hour after learning the [alleged] facts." *Id.* at 9.

withdrawal is incredible, and it's another reason to doubt that counsel believed the motion was "warranted on the law and the facts" in the first place. *Id.*

\* \* \*

Yes, Grayson had been treated for anxiety. Yes, anxiety "is to be expected" before an inmate's execution. DE95:46. But Grayson was not suffering a medical emergency on November 20 that a psychiatrist arbitrarily refused to treat, and it's unlikely that counsel believed as much. Rather, the picture that emerges is one of litigation tactics designed to throw another wrench in things at the last minute.

When Grayson's counsel implied that the Attorney General's Office had misrepresented the availability of medical treatment for prisoners, DE105:2-3, it was not the first time they had recklessly accused the Office of acting unethically. *See* DE61 (denying motion to disqualify counsel). Surely, there is enough "extreme time pressure" in these belated capital cases, *id.* at 2, without counsel creating such excess costs. Unfortunately, the evidence strongly suggests that was the true story behind the emergency motion filed on November 20, 2024.

## CONCLUSION

The Court should grant the motion for fees reasonably incurred when Grayson's counsel unreasonably and vexatiously multiplied these proceedings.

Respectfully submitted,
STEVE MARSHALL
ALABAMA ATTORNEY GENERAL
BY-

**/s/ Polly S. Kenny**
Polly S. Kenny
*Assistant Attorney General*

Robert M. Overing
*Deputy Solicitor General*

Dylan Mauldin
*Assistant Solicitor General*

Henry M. Johnson
*Assistant Attorney General*

Office of the Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2025, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will notify the following counsel for Plaintiff: **John Palombi, Esq., Spencer Hahn, Esq., Eric Brown, Esq., Kacey Keeton, Esq.,** and **Matt D. Schulz, Esq.**

                                Respectfully submitted,
                                STEVE MARSHALL
                                Alabama Attorney General
                                BY—

                                **/s/ Polly S. Kenny**
                                Polly S. Kenny
                                *Assistant Attorney General*
                                Office of the Attorney General
                                501 Washington Ave.
                                Montgomery, AL 36130
                                334-242-7300