IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CAREY DALE GRAYSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-00376-RAH-KFP |
| | ) | |
| JOHN Q. HAMM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Death penalty litigation is probably the most emotionally charged litigation that comes before the Court. And because Alabama is one of the few states that actively enforces the death penalty, that litigation is often filed in the Middle District of Alabama.  Lately, this District has become ground zero for challenges to a new method of execution—Nitrogen Hypoxia—which the State of Alabama recently sanctioned and has touted as a more humane method of execution.  If that method proves successful, it likely could become the default method in Alabama and other states.

At present, there have been five Nitrogen Hypoxia executions[1] in Alabama. Lawsuits were filed in three.  The condemned and their counsel have aggressively opposed the execution method with everything they might raise, ranging from complaints about the nitrogen gas, the number of pulse oximeters present in the chamber, the medical monitor leads, the mask, the qualifications of individuals

---

[1] The individuals executed by Nitrogen Hypoxia include Kenneth Smith, Alan Eugene Miller, Cary Dale Grayson, Demetrius Frazier, and Gregory Hunt.

involved in the execution, sedatives, vomiting, edema, and undiagnosed airway obstructions, to the time period to unconsciousness.  The purpose is obvious.

Other than challenging the Nitrogen Hypoxia methodology under the Eighth Amendment, the condemned and their counsel often come to the district courts to micromanage aspects of the execution process, ranging from access to pens, paper, watches, and phones, to—as the current motion presents—emergency requests for the rationale behind a medical decision; all of which have little to do with the Eighth Amendment.

Pending before the Court is the Defendants' *Motion for Attorneys' Fees* (doc. 114) which invokes 28 U.S.C. § 1927 and seeks attorneys' fees and costs in connection with the Federal Defenders for the Middle District of Alabama's[2] last-minute filing of an emergency motion that was voluntarily withdrawn less than twenty-four hours later.  According to the Defendants, "Grayson filed an emergency motion at 6:58 p.m. on November 20, the night before his execution, claiming that Defendants had rejected his request for appropriate medical care ('a therapeutic sedative') without reason, thus betraying their representations to this Court and leaving a sick inmate to suffer." (Doc. 114 at 1 (citation omitted).)  They further state that "[n]ot only was the basis for Grayson's motion false, but all that happened around 1:00 p.m., yet Grayson's counsel waited six hours, until after the close of business, to act." (*Id*.)  "Counsel made no attempt to confer, only emailing an ADOC attorney and counsel for Defendants at 6:57 p.m.—one minute before creating a judicial emergency.  As a result, Defendants and their counsel had to scramble overnight and in the early morning to uncover the facts, file a response, and prepare

---

[2] The Federal Defenders for the Middle District of Alabama ("Federal Defenders") is a private corporation funded by a grant from the federal judiciary.  The Federal Defenders regularly initiate litigation before scheduled executions.  And with respect to Grayson, they sued on his behalf twice.

for a conference with this Court while the case was pending in the U.S. Supreme Court and Grayson's execution was just hours away." (*Id.* at 2.)

According to the Defendants, Grayson's motion was false because 1) Grayson did visit with and was assessed by medical professionals, including a prison psychiatrist and nurse; 2) the motion omitted certain salient facts, such as the fact that the Federal Defenders prompted the medical visit and instructed Grayson to specifically ask prison medical staff for Midazolam (a drug that Grayson did not want and would not take); 3) Grayson told the medical staff that he was "good"; 4) prison medical staff gave Grayson reasons for not prescribing him Midazolam; and 5) Grayson expressed understanding and agreement with that medical decision. As the Defendants characterize it, "[t]he [Midazolam] request was designed for litigation, not driven by the client's 'medical necessity,' as the motion presented it" (*id.* at 15) (citation omitted) and was "calculated not only to disparage Defendants but also to provoke a reaction from the courts" (*id.* at 17) (citation omitted). That is, it was designed to threaten the State's ability to carry out Grayson's death sentence. The Defendants seek sanctions under 28 U.S.C. § 1927.

The Court has read the parties' submissions and has conducted a hearing. For the reasons that follow, the motion will be denied. That notwithstanding, the Court admonishes all counsel and reminds them of their obligations as Officers of the Court to always conduct themselves according to the highest standards of the legal profession, even in the face of high stakes, emotionally charged litigation such as this.

## LEGAL STANDARD

Under § 1927, any attorney who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct. A district court's authority to issue sanctions for attorney misconduct under

3

§ 1927 is either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1178 n.6 (11th Cir. 2005).

## BACKGROUND

### A.    Grayson's Previous Lethal Injection Litigation

To understand the issues presently before the Court, a discussion of Grayson's litigation history, with help from the Federal Defenders, involving Alabama's execution protocols is necessary.

In 2012, several inmates represented by the Federal Defenders filed suit against Alabama prison officials over the State's then-existing lethal injection protocol. *See In re Alabama Lethal Injection Protocol Litig.*, No. 2:12-CV-00316, 2018 WL 3014802 (M.D. Ala. June 15, 2018) [hereinafter *Lethal Injection Protocol Litigation*]. Grayson was one of the plaintiffs in that litigation. Through the Federal Defenders, Grayson claimed the State's lethal injection protocol constituted cruel and unusual punishment and thus violated the Eighth Amendment. Grayson also claimed it was a First Amendment violation for the State to refuse Grayson's attorney-witnesses direct and immediate access to and communication with the courts during his execution. Through counsel, Grayson faulted the protocol's use of Midazolam as an *anesthetic* drug to prevent, what Grayson claimed, intolerable pain associated with the other drugs used in the protocol. Grayson also alleged that for a small percentage of people, Midazolam has the opposite effect from sedation in that it causes agitation, not sedation. On his behalf, the Federal Defenders offered three alternative methods of execution that passed constitutional muster, one of which was execution by Nitrogen Hypoxia through the introduction of pure nitrogen via a mask following the administration of an *anxiolytic*, such as Midazolam.

The litigation was later dismissed in July 2018 after the State of Alabama passed a law, *see* Ala. Code § 15-18-82, making Nitrogen Hypoxia a statutorily approved method of execution.  At the time, the State had not developed a protocol to conduct such an execution.  As such, inmates who elected Nitrogen Hypoxia were assured of no execution setting in the near future.

### B.  Nitrogen Hypoxia Protocol and Resulting Lawsuits

The new law gave already-condemned inmates thirty days to elect Nitrogen Hypoxia.  *Id.* § 15-18-82.1(b)(2).  And during that election period, the Federal Defenders drafted an election form and met with numerous inmates on death row to assist them in understanding the new law and the form.  *See Smith v. Dunn*, 568 F. Supp. 3d 1244, 1251 (M.D. Ala. 2021) (discussing the opt-in election form).  At least fifty inmates timely elected Nitrogen Hypoxia, many with help from the Federal Defenders.  Additionally, two inmates who were scheduled for executions by lethal injection filed lawsuits seeking tardy designations of Nitrogen Hypoxia through arguments such as lost election forms, *see Miller v. Hamm*, 640 F. Supp. 3d 1220, 1233 (M.D. Ala. 2022), and non-ADA compliant election forms, *see Reeves v. Dunn,* 580 F. Supp. 3d 1060, 1066–67 (M.D. Ala. 2022), *aff'd sub nom. Reeves v. Comm'r, Ala. Dep't of Corr.*, 23 F.4th 1308 (11th Cir. 2022), *and vacated sub nom. Hamm v. Reeves*, 142 S. Ct. 743 (2022).

### C.  Grayson's Nitrogen Hypoxia Case

#### 1.  Complaint

On June 10, 2024, the State of Alabama sought a death warrant from the Alabama Supreme Court as to Grayson.  Since Grayson had elected an execution by Nitrogen Hypoxia, if issued, his execution would be the third execution under Alabama's new method.  As to the two previous Nitrogen Hypoxia executions, the

press, certain witnesses, and attorneys raised concerns about the duration of the executions and the condemned inmates' time-to-unconsciousness.

On June 28, 2024, Grayson, through the Federal Defenders, filed this lawsuit, challenging the State's Nitrogen Hypoxia protocol under the Eighth Amendment.[3] The Complaint alleged the protocol would cause "conscious suffocation" and therefore would violate the Eighth Amendment.  The Complaint also offered two allegedly feasible alternatives: (1) a Nitrogen Hypoxia protocol that included a medical assessment for anxiety and airway obstruction issues and required the use of Midazolam and Ketamine before the introduction of nitrogen gas to minimize conscious suffocation, and (2) injection of a fatal amount of Ketamine and Fentanyl. According to the Complaint, the medical assessment was needed because of possible anxiety disorders such as "claustrophobia," and the use of Midazolam and Ketamine would render the inmate unconscious before the introduction of nitrogen gas.  (Doc. 42 at 12.)  The Complaint sought to prohibit Grayson's execution under the State's then-existing Nitrogen Hypoxia protocol.

### 2. The Federal Defenders' Accusation of Unethical Conduct by the Attorney General's Office

Several weeks into the case, in their briefing on their request for a preliminary injunction, the Federal Defenders accused the Office of the Alabama Attorney General of unethical conduct.  (*See* doc. 20 at 1 n.1.)  The Court instructed the Federal Defenders to file a formal motion to disqualify if they thought the motion was warranted.  They did so.

On August 28, 2024, the Federal Defenders filed their *Motion to Disqualify Defendant Marshall from Representing His Co-Defendants*.  (Doc. 38.)  In it, the Federal Defenders accused the Attorney General's Office of "serious conflict of

---

[3] Grayson later amended his Complaint on August 30, 2024. The term "Complaint" refers to operative Amended Complaint (doc. 42).

interest and ethical issues" and sought a court order "disqualify[ing] Defendant Marshall from representing his co-defendants and controlling the representation of Defendants Hamm and Raybon." (*Id.* at 2.) The accusations largely stemmed from the Office's involvement in drafting the original Nitrogen Hypoxia protocol, claimed conflicts between the Office and the Alabama Department of Corrections' ("ADOC") in-house counsel, and the possible witness status of several attorneys from the Office who had previously testified about their use and testing of the type of mask called for in the Nitrogen Hypoxia protocol. The Federal Defenders' motion asserted that the Attorney General's Office was conflicted because the Attorney General could not abide by the loyalty and wishes of his clients (Terry Raybon, Warden at Holman Correctional Facility, and John Hamm, Commissioner of the ADOC) in violation of Rule 1.2 of the Alabama Rules of Professional Conduct. (*See id.* at 12–13.)

Needless to say, the Federal Defenders' motion was vigorously opposed. On September 18, 2024, the Court denied the Federal Defenders' motion. (*See* doc. 61.) The Court had hoped that the accusations of unethical conduct in the case were over. They were not.

### 3.    Designation of Spiritual Advisors

In 2020, the issue of the presence of spiritual advisors in the execution chamber came to a head. Specific to Alabama, on February 11, 2021, the United States Supreme Court refused to vacate an Eleventh Circuit order, *see Smith v. Comm'r, Ala. Dep't of Corr.*, 844 F. App'x 286 (11th Cir. 2021), that required ADOC to allow the presence of Willie B. Smith, III's pastor in the execution chamber with him.[4] *See Dunn v. Smith*, 141 S. Ct. 725 (2021). Following that

---

[4] Smith's vehicle to have his pastor in the death chamber came by way of the Religious Land Use and Institutionalized Person Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc et seq., and the Alabama Religious Freedom Amendment to the Alabama Constitution, Ala. Const. art. I, § 3.01 (ARFA).

decision, ADOC modified its execution protocol to allow "spiritual advisors" in the execution chamber, but it did not allow any other witnesses or attorneys in the chamber.  Since that time, spiritual advisors in the form of pastors and imams have been allowed in the chamber.

After Grayson's lawsuit was filed, on August 19, 2024, Kacey Keeton, an attorney with the Federal Defenders and one of Grayson's attorneys, sent a letter to ADOC's general counsel stating that "Mr. Grayson would like to have counsel with him up until the time of execution *in lieu of a spiritual advisor*."  (Doc. 136-1 at 9 (emphasis added).)  Keeton also stated in her letter that counsel would like "to wear a watch to observe the execution," and to bring a pen, paper, and activated cell phone with her.  (*Id*.)

The next day, ADOC's general counsel responded by stating that Grayson could not have an attorney present with him in lieu of a spiritual advisor but counsel could attend the execution as a "witness" in the witness room, that there already was a clock, and that a pen and paper would be available provided there was a timely request but that no phones would be permitted.  (Doc. 136-1 at 11.)  In other words, Keeton's request to be present inside the chamber and to document the execution as Grayson's attorney was rejected.

Keeton, however, was not deterred.  Ten days later, on August 29, 2024, Keeton sent a letter to the ADOC warden in charge of Grayson's execution.  (*See* doc. 84-24 at 1.)  Despite being rebuffed in her initial efforts to attend the execution in the chamber as an attorney *in lieu of a spiritual advisor* with a pen, paper, watch and cell phone in hand, Keeton in her letter stated that Grayson was now designating Keeton and fellow Federal Defender attorney Matt Schultz as his "designated spiritual advisor" and "designated alternate."  (*Id*. at 1–2.)  ADOC did not challenge the designations.

### 4.    Preliminary Injunction Motion

On August 20, 2024, the Federal Defenders filed a *Motion for Preliminary Injunction*.  (*See* doc. 30.)  In their motion, the Federal Defenders sought to enjoin Grayson's looming execution under the current Nitrogen Hypoxia protocol.  The motion focused upon the claimed eye-witness observations from the recent Nitrogen Hypoxia execution of Kenneth Smith.[5]  The Court set the motion for a hearing on October 8, 2024.

In connection with his preliminary injunction request, Grayson sat for his deposition on October 2, 2024, with two attorneys from the Federal Defenders (Spencer Hahn and Matt Schultz) present and was asked about Midazolam, his lawsuit, and Nitrogen Hypoxia.  Concerning Midazolam, Grayson testified that "No, I do not want midazolam," that it is a "weak" and "half-assed" drug, and "that's not a drug I want."[6]  (Doc. 81-1 at 8; Doc. 84-53 at 44.)  Then, when asked about his complaint allegations that called for an oral dose of Midazolam followed by an injection of Ketamine, Grayson said, "This does not sound like my case.  This sounds like Miller . . . . [W]e never discussed that.  That is Miller."[7]  (Doc. 81-1 at 12; Doc. 84-53 at 64.)

---

[5] The Federal Defenders also filed a motion requesting permission to videotape the upcoming Nitrogen Hypoxia execution of Alan Miller.  (*See* doc. 50.)  The request was denied.

[6] Grayson's testimony was somewhat similar to the allegations the Federal Defenders made in the *Reeves* litigation, where allegations were made that there is a high likelihood that Midazolam is incapable of reliably causing the sustained anesthetic state of sufficient depth necessary to prevent an inmate from experiencing intolerable pain associated with the second and third drugs, and that because of the way it functions, Midazolam could sedate an individual to the point of being incapable of communicating that he is in pain while doing nothing to prevent the experience of that pain, and that a certain percentage of people become agitated, not sedated, because of it. Complaint at 3–4, *Reeves v. Dunn*, 580 F. Supp. 3d 1060 (M.D. Ala. 2022), *aff'd sub nom. Reeves v. Comm'r, Ala. Dep't of Corr.*, 23 F.4th 1308 (11th Cir. 2022), *and vacated sub nom. Hamm v. Reeves*, 142 S. Ct. 743 (2022).

[7] Kenneth Smith also had sued over the State's Nitrogen Hypoxia protocol.  *See Smith v. Hamm*, No. 2:23-cv-656-RAH, 2024 WL 116303 (M.D. Ala. Jan. 10, 2024).

Concerning Nitrogen Hypoxia as an alternative method of execution that was advanced by the Federal Defenders on his behalf in the lethal injection litigation from years before, Grayson said the following about his and the Federal Defenders' "plan":

> We had a plan. Our plan was to cost as much money, make it as easy as it can be done, as expensive as it can be done, and as shockingly as it could be done. So I went looking for shocking. And I found nitrous gas. John[8] went looking for something. And that's what we came up with. It was a stalling tactic. But if it didn't stall well enough I didn't suffer at the end. They got me.

(Doc. 81-1 at 14–15; Doc. 84-53 at 75–76.)

At the preliminary injunction hearing, significant argument ensued on the use of a sedative and other drugs before the introduction of nitrogen gas. The drug discussed the most was Midazolam,[9] which was the drug referenced in the Complaint's alternative Nitrogen Hypoxia execution protocol, the drug that Grayson challenged in his previous lethal injection litigation, and the drug that Grayson said he did not want and would not take.[10] Testimony was provided about the risks associated with Midazolam, such as suppressed breathing, airway obstruction, edema, and nausea, that could complicate the introduction of nitrogen gas, as well as the mechanisms in which it would be introduced, especially in the context of an inmate who was unwilling to ingest a pill. (*See, e.g.*, doc. 89 at 125.) Further, there was discussion about the many lawsuits filed over execution protocols that included the use of Midazolam.

---

[8] "John" was John Palombi with the Federal Defenders.

[9] Midazolam is a benzodiazepine which can act like a muscle relaxant.

[10] Midazolam was mentioned at least 136 times during the preliminary injunction hearing, and even Grayson's counsel stated that "midazolam and Mr. Grayson have a history." (Doc. 87 at 17.)

All medical experts acknowledged the fact that medical ethics precluded licensed doctors from aiding an execution, thereby making it difficult for any medical doctor to prescribe a drug in aid of an execution. Because of this position, the Court queried ADOC's Deputy Commissioner of Health Services about whether a medical doctor could prescribe a sedative *if therapeutically appropriate*; that is, if it was for therapeutic purposes and not in aid of the execution. That witness responded that it was possible. (*See* doc. 87 at 116–17.)

On November 6, 2024, the Court issued its opinion that denied Grayson's preliminary injunction motion. *See Grayson v. Hamm*, No. 2:24-cv-00376, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024). In its opinion, the Court referenced the possibility that Grayson could seek a sedative or anxiolytic medication for therapeutic reasons and not in aid of an execution. *Id.* at *4, *20. On appeal, in its November 18, 2024, opinion, the Eleventh Circuit also referenced this same possibility. *See Grayson v. Comm'r, Ala. Dep't of Corrs.*, 121 F.4th 894, 899 (11th Cir. 2024).

On November 19, 2024, the Federal Defenders file a certiorari petition with the United States Supreme Court. The petition was denied at approximately 11:00 a.m. on November 21, 2024, thereby clearing the way for the execution to go forward later that day. Grayson was executed early that evening via Nitrogen Hypoxia.

### 5.    The Events of November 20, 2024

On November 20, 2024—the day before the execution—Grayson was visited by several employees from the Federal Defender's office, including Robin Konrad (attorney), Christine Freeman (attorney), Kacee Keeton (attorney), Spencer Hahn (attorney), Leslie Smith (attorney), Eric Brown (attorney), John Palombi (attorney), Matt Schultz (attorney), Nancy Palombi (paralegal), Brandi Janus (paralegal), and Miriam Bankston (paralegal) beginning at approximately 8:40 a.m. that day. (*See*

doc. 114-1 at 8–9.)  Important to the events at issue in the Defendants' sanctions motion are the actions of Ms. Keeton and Mr. Hahn that day.

At approximately 12:45 p.m., Ashley Wall Andrews, a nurse at Holman Correctional Facility, approached Grayson in the visitation yard window. (Doc. 114-3 at 2–3.)  Nurse Andrews reminded Grayson that he had a telehealth appointment scheduled with Dr. Bradley Edmonds, a prison psychiatrist, that afternoon. (*Id.* at 3; Doc. 108-1 at 1; *see* doc. 114-2 at 2.)  Grayson responded that he was "good" and did not need to see Dr. Edmonds. (Doc. 114-3 at 3.)  This was not the first time that Grayson wanted to cancel a medical visit, as Grayson had previously refused visits on November 13 and November 16. (Doc. 114-1 at 18; Doc. 114-2 at 4.)  Nurse Andrews then requested that Grayson sign a refusal form. (Doc. 114-3 at 3.)

Keeton then approached, asked Grayson about the refusal form, and told Grayson that he needed to attend the telehealth visit and not refuse. (Doc. 108 at 1–2.)  Grayson changed course and said to Nurse Andrews that he did not want to refuse and wanted to see Dr. Edmonds. (*Id.*)  Afterwards, Nurse Andrews scheduled the telehealth visit with Dr. Edmonds for around 1:00 p.m. (Doc. 114-1 at 19.)

Grayson attended the telehealth visit with Nurse Andrews and Dr. Edmonds at approximately 1:00 p.m. (*Id.*)  Keeton was not present, but she assumed that Grayson was meeting with a doctor. (*See* doc. 120-1 at 5.)  At the outset of the visit, Grayson handed Nurse Andrews a handwritten note[11] that Grayson said was from his attorney. (Doc. 108-1 at 2; Doc. 114-3 at 4.)  According to Nurse Andrews, the note made a specific request for Midazolam—"You need midazolam." (Doc. 114-3 at 4; *see* doc. 108-1 at 2.)  Grayson held up the note and stated that his attorneys had asked him to request Midazolam. (Doc. 114-3 at 4.)  Keeton somewhat disputes this testimony in that she acknowledges writing Midazolam on the note but states that

---

[11] Unfortunately, the note cannot be located and has not been presented to the Court for inspection.

she struck it out when Grayson told her that he did not want Midazolam.  (Doc. 142 at 17, 54.)

According to Dr. Edmonds, he already was familiar with Grayson, as he had been managing Grayson's medications for months.  (*See* doc. 114-2 at 3–4.)  During the telehealth visit, he spoke with and assessed Grayson.  (*Id.* at 4; Doc. 114-1 at 19.)  Grayson told him that he only came to speak with him because his attorney suggested it and that his attorney wanted him to ask for Midazolam.  (Doc. 114-2 at 5.)  Grayson also told Dr. Edmonds that he wanted a different medication for his anxiety but that if Midazolam was prescribed, he would not take it.  (Doc. 114-1 at 18.)  Dr. Edmonds responded that he was unwilling to add another medication, let alone Midazolam, to Grayson's current medication regimen (Xanax) at that point.  (*Id.*).  Grayson voiced his understanding and left.  (*Id.*).

Nurse Andrews had a similar recollection of the interaction with Grayson.  (Doc. 108-1 at 1–2; Doc. 114-3 at 3.)  According to Nurse Andrews, Dr. Edmonds told Grayson he had never prescribed Midazolam (i.e., Versed) before and that if he prescribed it to Grayson, he feared that Grayson stood a chance of having an adverse reaction because he already was on a high dose of Xanax.  (Doc. 108-1 at 2; Doc. 114-2 at 5.)  Grayson then said that he was "good" and that his lawyer wanted him to ask, but that if they prescribed it, he would not take it.  (Doc. 108-1 at 2; Doc. 114-2 at 4; 114-3 at 4.)  Grayson then thanked Dr. Edmonds and left, and the telehealth visit was terminated.  (Doc. 108-1 at 2; Doc. 114-3 at 4.)

Grayson returned to the visitation yard where he again visited with the Federal Defenders.  (Doc. 114-1 at 10.)  Later that afternoon, Brown, Freeman, Smith, Bankston, and Hahn left the prison; Keeton remained with Grayson for a while longer.  (*Id.*)

Around 4:00 p.m., Keeton drafted a Sick Call Request for Grayson.  (*Id.* at 45.)  In the request, Keeton wrote that Grayson struggled with "claustrophobia," was

suffering "significantly higher anxiety," and therefore wanted a "sedative" for the execution tomorrow "in addition to [his] Xanax prescription."[12]  (*Id.* at 17, 45.) Grayson gave the request to Nurse Andrews when she passed by the visitation yard. (Doc. 114-3 at 5.)

Nurse Andrews gave the request to Nurse Elaine Champion in the health care unit and advised her that Grayson had previously requested a sedative, particularly Midazolam, earlier in the day from Dr. Edmonds and that Dr. Edmonds had denied the request.  (*Id.*)  The request was processed by Nurse Hendricks, who completed an inmate body chart, intake form, and made a mental health referral to Dr. David Estep.  (Doc. 114-1 at 42–43.)  Nurse Hendricks also noted that Grayson said that his attorney told him to ask for Midazolam.  (*Id.* at 43.)

Nurse Hendricks then contacted Dr. Estep. (*See* doc. 114-1 at 17, 44.) According to Dr. Edmonds, he spoke with Dr. Estep that afternoon about Grayson's Sick Call Request and told him that Grayson already was prescribed an appropriate dose of Xanax, that he did not want to create an adverse event, and that he could not prescribe a medication that was not therapeutically warranted.  (Doc. 114-2 at 5.) As such, Grayson was not given any new prescriptions on top of what he already was taking.

### 6.    The Emergency Motion

At some point later that day, Keeton and Hahn spoke over the phone during which they discussed Grayson's two medical visits and that Grayson, according to Keeton, had approved the filing of an emergency motion on his behalf.

---

[12] Until Keeton wrote it in the Sick Call Request, there had been no previous assertion in the case or in any medical record that Grayson suffered from "claustrophobia," not even at the preliminary injunction hearing when the Federal Defenders advanced a host of reasons as to why Grayson's execution could not go forward.

At 6:57 p.m., while Grayson's appeal remained before the United States Supreme Court and after Hahn returned to the Federal Defenders' office in Montgomery, Hahn emailed ADOC's legal counsel. In his email, Hahn stated that at 1:00 p.m. that day Grayson had a telehealth appointment with the prison health provider for his "severe and increasing anxiety and distress about his execution by nitrogen hypoxia and asked if a sedative could be provided prior to his execution." (Doc. 114-4 at 76.) Hahn added that "*[t]he provider made no medical assessment*, but simply told him it was 'too late' to make such a request." (*Id.* (emphasis added).) Hahn then detailed that Grayson had also submitted a sick call slip to prison health professionals about his increasing distress and had requested a medical assessment of his need for a sedative before his execution because "his Xanax [wa]s no longer providing relief." (*Id.* at 76.) Hahn also stated that Grayson received a physical exam at approximately 4:30 p.m. but was told that he would be referred back to the mental health provider to address his request for a sedative. (*Id.* at 76–77.) Hahn closed by stating, "We do not have time to wait, and I am filing an emergency motion in the District Court case to ensure this is resolved." (*Id.* at 77.)

Almost simultaneously, at 6:57 p.m., Hahn, with the approval of Christine Freeman, Executive Director of the Federal Defenders, filed what he styled as an *Emergency Motion for Order Requiring Defendants to Provide a Reasoned Decision on Mr. Grayson's Request for a Therapeutic Sedative Prior to His Execution* (doc. 105). Although the motion contained the electronic signatures of Palombi, Hahn, Brown, Keeton, and Schultz, of that group only Hahn saw it beforehand because he was the one who drafted it. In the motion, Hahn stated that because time was of the essence, the motion was being filed immediately without having heard back from ADOC's counsel, though he had emailed ADOC only the minute prior. In the motion, Hahn stated the following concerning that day's events:

15

At approximately 1:00 p.m. on November 20, 2024, Mr. Grayson had a telehealth appointment with the prison mental health care provider. During that appointment, Mr. Grayson expressed his severe and increasing anxiety and distress about his execution by nitrogen hypoxia and asked if a sedative could be provided prior to his execution. **The provider made no medical assessment, but simply told him it was "too late" to make such a request.**

Mr. Grayson then submitted a "sick call" slip to prison health officials noting his increasing distress about his pending execution by nitrogen hypoxia and requesting a medical assessment of his need for a sedative before his execution. He noted his Xanax is no longer providing relief from the increasing anxiety he feels about his execution. He received a physical exam shortly after 4:30 p.m. and was told he would be referred to the prison mental health provider to address his request for a sedative.

Given the prison mental health provider has already told him it is "too late" to receive a medical determination of his need for a sedative before his execution, this amounts to a non-denial denial by prison health and mental health officials.

Before this Court, Defendants represented—through Deborah Crook of ADOC Health Services and in argument—that a condemned prisoner could receive a sedative via prison health services if it was therapeutically appropriate before an execution. This Court relied on that representation and testimony in denying a preliminary injunction.

Mr. Grayson is in a no man's land—having been shuffled between prison health services and prison mental health services—***with no medical assessment of his request having been made***. He has, instead, been told by prison health services that prison mental health services will address his issue and has been told by prison mental health services that it is "too late" for any sedative regardless of medical necessity.

For the foregoing reasons, Mr. Grayson respectfully requests this Court issue an order directing Defendants to provide a reasoned decision on his request for a therapeutic sedative. If the decision is to deny the sedative, Mr. Grayson reserves the right to file a motion for preliminary injunction requiring prison health officials to provide a therapeutic sedative before his execution.

(Doc. 105 at 1–3 (emphasis added).)

### 7.    The Defendants' Response

The following morning at 7:10 a.m.—the day of the scheduled execution and while Grayson's appeal to the Supreme Court remained pending—the Court issued a text order requiring the Defendants to show cause by 10:30 a.m. as to why the emergency motion should not be granted.  (Doc. 106.) The Court also set a telephonic hearing for 11:30 a.m.  (Doc. 107.)

At 9:36 a.m., counsel for the Defendants emailed Hahn about the statements in his emergency motion.  (Doc. 114-1 at 79.)  In the email, counsel attached the nurse's summary of events from the day before concerning her interaction with Grayson and stated that Hahn's motion "does not provide a complete and correct picture to the court and the grounds of your motion are frivolous at best.  We encourage you to withdraw the motion immediately."  (*Id*.)

Hahn responded two minutes later that he would review the email with his team.  (*Id.*)  Then, two minutes after that, Hahn emailed counsel again, stating that "We'll be moving to withdraw the motion."  (*Id.* at 78.)  Hahn also emailed the court deputy stating that "[i]n light of new information received from counsel for Defendants, we will be filing a motion to withdraw our emergency motion."  (Doc. 120-4 at 3.)  Neither Hahn nor anyone from the Federal Defenders consulted with Grayson before the emergency motion was withdrawn.

At 10:16 a.m., Hahn filed a motion to withdraw the emergency motion.  (Doc. 109.)  In it, Hahn stated that "[g]iven the information received from counsel for Defendants this morning and what appears likely to be a factual dispute that cannot be resolved on short notice," he was withdrawing the emergency motion.  (*Id*. at 1.) Based on Hahn's filing, the Court canceled the hearing.  Again, Grayson was not consulted; although, according to Keeton, Grayson, who had been "crying,"

"begging," "yelling," and suffering from severe anxiety, had purportedly approved the emergency motion the day before.  (Doc. 120-1 at 5.)

Later that day, Dr. Edmonds adjusted Grayson's existing Xanax dosage before the looming execution.  (Doc. 114-2 at 6.)  The Supreme Court also denied Grayson's certiorari request, and the execution went forward at approximately 6:00 p.m.  Grayson was pronounced dead minutes later.

On December 16, 2024, the Defendants filed their *Motion for Attorneys' Fees*. (Doc. 114.)  An in-person hearing was held on April 16, 2025, during which the Court heard argument from counsel, including Hahn and Keeton.[13]

## DISCUSSION

### A.    28 U.S.C. § 1927

To begin, the Defendants invoke 28 U.S.C. § 1927 as the basis for their motion, not Rule 11 or the Court's inherent powers.  In pertinent part, § 1927 provides as follows:

> Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

Because § 1927 is penal in nature, it must be strictly construed.  *Peterson v. BMI Refractories*, 124 F.3d 1386, 1395 (11th Cir. 1997).  To obtain a sanctions award under § 1927, the moving party must show that "(1) an attorney . . . engage[d] in unreasonable and vexatious conduct; (2) such unreasonable and vexatious conduct . . . multipl[ied] the proceedings; and (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct."  *Norelus v. Denny's, Inc.*, 628

---

[13] Although Palombi was the first signatory on the emergency motion, he was excused from attending the hearing due to health reasons.  He has since passed away.

F.3d 1270, 1281 (11th Cir. 2010) (citation and internal quotation marks omitted). As the Eleventh Circuit has explained, "[a]n attorney multiplies the proceedings unreasonably and vexatiously 'only when the attorney's conduct is so egregious that it is tantamount to bad faith.'" *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010) (quoting *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007)). This standard "is satisfied when an attorney knowingly or recklessly pursues a frivolous claim." *Id.* (citation omitted). In this regard, "[t]he statute imposes a 'high standard' that requires the moving party to show that the other side engaged in behavior that 'grossly deviates from reasonable conduct.'" *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020) (quoting *Amlong*, 500 F.3d at 1240, 1242). Section 1927 "is not a 'catch-all' provision for sanctioning objectionable conduct by counsel." *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003) (citation omitted); *see also Amlong*, 500 F.3d at 1242.

Whether bad-faith conduct is sanctionable under § 1927 is determined by an objective standard—the attorney's subjective intent has no bearing on the analysis. *Amlong*, 500 F.3d at 1239. In other words, the court "must compare the attorney's conduct against the conduct of a 'reasonable' attorney and make a judgment about whether the conduct was [objectively] acceptable." *Id.* at 1239–40. "'Bad faith' is the touchstone. Section 1927 is not about mere negligence. A determination of bad faith is warranted where an attorney knowingly or recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims." *Schwartz*, 341 F.3d at 1225 (citations omitted).

"Reckless" conduct is sufficient to justify sanctions under § 1927. *Norelus*, 628 F.3d at 1291 (citation omitted). Reckless conduct simply means conduct that grossly deviates from reasonable conduct. *See Schwartz*, 341 F.3d at 1227 (describing recklessness as "a gross deviation from conduct that might be reasonable in the circumstances"); W. Page Keeton et al., *Prosser and Keeton on the Law of*

*Torts* § 34 (5th ed. 1984) (stating that although the term "recklessness" seems to suggest a certain state of mind, recklessness usually "can be proved only by the conduct and the circumstances," and "an objective standard must of necessity in practice be applied"); *Reckless*, *Black's Law Dictionary* (12th ed. 2024) ("Reckless conduct is . . . a gross deviation from what a reasonable person would do."). Under the objective test, a district court *may not* excuse counsel's reckless conduct because she acted "with an empty head and a pure heart." *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987) (internal quotation marks omitted) (quoting *McCandless v. Great Atl. & Pac. Tea Co.*, 697 F.2d 198, 200 (7th Cir. 1983)).

When scrutinizing counsel's conduct after-the-fact and contemplating the imposition of resulting sanctions, courts are expected to be mindful that they should not punish counsel under § 1927 merely for zealous advocacy or for being on the losing side of a case. Accordingly, in evaluating litigation conduct following the resolution of a case, the Eleventh Circuit has advised courts to refrain from:

> engag[ing] in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action[s] must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief . . . [and] no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts *appear questionable or unfavorable at the outset*, a party may have an entirely reasonable ground for bringing suit.

*Cordoba*, 419 F.3d at 1181–82 (emphasis added) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22 (1978)). In the same vein, it is judicious for courts to remember that "§ 1927 does not distinguish between winners and losers" and "is indifferent to the equities of a dispute and to the values advanced by the substantive law." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 762 (1980).

If an attorney's misconduct meets the high standard of § 1927, a district court may order the attorney to pay the "costs, expenses, and attorneys' fees reasonably incurred" because of the attorney's misconduct—that is, the excess costs that the attorney's multiplication of proceedings has added to the cost of the litigation. 28 U.S.C. § 1927; *Peterson,* 124 F.3d at 1396 (explaining that sanctions under § 1927 "must bear a financial nexus to the excess proceedings").

### B.    The Federal Defenders' Conduct

As the Defendants characterize it, "[t]he [Midazolam] request was designed for litigation, not driven by the client's 'medical necessity,' as the motion presented it," (doc. 114 at 15), and was "calculated not only to disparage Defendants but also to provoke a reaction from the courts" especially given the last-minute, after-hours nature of the filing over an issue known for hours (*id.* at 17). That is, it was designed to threaten the State's ability to carry out Grayson's death sentence, like the last-minute filings of the attorneys in the recent *Price*[14] litigation. In other words, aside from the claimed exigency of the motion manufactured by the Federal Defenders' intentional delay in filing it, the emergency motion contained numerous false and incomplete statements, the purpose of which was to manufacture a false narrative and have this Court or the Eleventh Circuit revisit the grounds for previously denying Grayson's preliminary injunction request.

The Federal Defenders respond, largely stating that § 1927 is a penal statute; that the Defendants' factual assertions are inaccurate; that their conduct was appropriate, responsible and reasonable[15] given the pressures and time exigencies

---

[14] *Price v. Dunn*, No. 1:19-cv-00057 (S.D. Ala. June 5, 2019).

[15] The Federal Defenders also present a declaration from Professor Eric M. Freeman, Esq., who states that, in his opinion, the actions of the Federal Defenders in filing the emergency motion were in accordance with the norms and standards applicable to death penalty representation. (*See* doc. 136-6.) The Court finds the declaration of little relevance here since it depended on a far too narrow scope of facts.

associated with the looming execution of their client; that they did not lie to the Court; that at worst their conduct was a mistake and negligent but not bad faith; that they should not be punished for their zealous advocacy; that the discussions between Grayson and Keeton about Midazolam are extraneous and irrelevant to the filing of the emergency motion itself; and that the Federal Defenders promptly withdrew their emergency motion when they received new information about Grayson's medical visits. They also assert that their emergency motion was successful in that it resulted in a change of Grayson's medication protocol on the day of his execution.[16]

To begin with, the Defendants' sanctions motion is directed to all of the attorneys whose names and signatures appear on the emergency motion: Palombi, Hahn, Brown, Keeton, and Schultz. (*See* doc. 105.) The parties' submissions and the discussions at the hearing confirm that Hahn drafted the emergency motion, which was reviewed and approved by Federal Defender Executive Director Christine Freeman, and that the motion was filed, under the signatures of Hahn and Keeton, after a discussion between Hahn and Keeton about the events involving Grayson and Keeton at Holman Correctional Facility. As such, the Court finds that consideration of the sanctions motion should focus on the actions of Hahn and Keeton. While Ms. Freeman apparently was present at Holman Correctional Facility on November 20 and reviewed and approved the emergency motion before it was filed, the Court concludes there simply is not enough evidence to find that she acted recklessly or in bad faith for purposes of § 1927, especially since she did not sign the emergency motion.

---

[16] In their response, the Federal Defenders discuss issues concerning Grayson's access to a tablet, pen, and paper, and then present those issues as evidence of the issues that regularly arise in the frantic hours before an execution. The Court sees little relevance to the matter at hand. If it is offered to show that the Federal Defenders had many distractions that day, it does not prove the point as the Federal Defenders had no less than eleven staff members at Holman Correctional Facility with Grayson on November 20 including eight attorneys.

The Court will first address Keeton's conduct. According to Keeton, Grayson told her on November 20 that, due to increasing anxiety, he wanted to request a sedative, that Grayson requested her assistance, that Keeton drafted a note for Grayson to give to prison medical staff and initially suggested Midazolam because she knew it was available, that Grayson rejected Keeton's initial suggestion of Midazolam, and that she then struck out the word Midazolam on the note. She further states that after attending the mental health appointment, Grayson returned and told her that medical staff told him that it was "too late" to put him on something new, and that she and Grayson then decided to take another route by filling out a formal Sick Call Request. Keeton filled out the Sick Call Request, and then later that afternoon, Grayson told her that he had seen a nurse for the sick call, and they—presumably medical staff—told him they would refer the request back to the same mental health staff who had previously said it was too late. Keeton further states that later that afternoon, she observed Grayson "crying," "yelling," and "begging" for help because of his increasing anxiety, and therefore she then consulted with Grayson about filing an emergency motion, obtained his permission to do so, and then relayed this request and information to Hahn, who drafted and filed the emergency motion. (Doc. 120-1 at 5–6.)

According to Hahn, when defense counsel emailed him on the morning of November 21 with the nurse's summary of the events, this information "was new, unknown, and previously unavailable to Mr. Grayson's counsel" and that the information satisfied the relief they were seeking in terms of a reasoned decision. (Doc. 120 at 10.) Hahn also states that he realized it would be a disputed factual issue, and rather than remove the Federal Defenders from their final visits with Grayson so that they could defend their motion, they withdrew it.

Keeton and Hahn close by saying that "Mr. Grayson's counsel were operating in circumstances which necessarily required that they rely upon the client for facts"

and "[t]hat is not sanctionable." (*Id.* at 15.)

The Court agrees with the Defendants that, at a minimum, the emergency motion was misleading and woefully short on very important details that, had they been presented, would have undermined the characterization the emergency motion was intended to make. The motion conveyed the narrative that ADOC simply shut the window on a legitimate medical request from Grayson, without conducting an examination and without determining whether a sedative was therapeutically appropriate, thereby calling into doubt ADOC's previous testimony at the preliminary junction hearing.

And the Court notes its concerns that the Federal Defenders' rendition of the events and the basis for filing the emergency motion—last-minute and after-hours—contains glaring contradictions and omissions of key facts important to the emergency relief that the Federal Defenders claimed was necessary.

For starters, Keeton's testimony about the note contradicts the medical providers who read the note. The medical providers interpreted Keeton's note as specifically requesting Midazolam while Keeton says she struck the word Midazolam out. Unfortunately, the note—the best evidence of what Keeton wrote and whether she did strike out Midazolam as she now says—has not been provided. Omitted in her version of events is a satisfactory explanation for why she would even write down and suggest Midazolam in the first place. After all, she certainly was aware of Grayson's position about the drug and was aware of the significant debate about the drug at the preliminary injunction hearing where it was offered by the Federal Defenders as part of an alternative execution protocol. And it easily can be inferred that Keeton's suggestion of Midazolam was not for a true therapeutic need but instead for purposes of challenging the ADOC's preliminary injunction testimony. In other words, the evidence suggests there was an ulterior motive at play, and that it formed the basis for the emergency motion.

24

On this issue, the Defendants have presented medical records and affidavit testimony from Nurse Andrews and Dr. Edmonds—two disinterested individuals—that contradict the emergency motion's assertion about the lack of a medical assessment.  That testimony shows that Grayson met with nursing staff and initially declined a telehealth appointment and was about to sign an appointment refusal form until Keeton intervened to instruct Grayson otherwise; that the handwritten note Grayson gave to medical staff specifically requested Midazolam; that Grayson did in fact participate in the telehealth visit with Dr. Edmonds and Nurse Andrews; that Grayson told Dr. Edmonds and Nurse Andrews that his attorneys (Keeton) told him to ask for Midazolam; that Grayson was already taking Xanax; that Dr. Edmonds told Grayson that he was not comfortable prescribing Midazolam on top of what Grayson was already taking; and that following this telehealth visit, Grayson returned to the visitors' yard where he continued to meet with the Federal Defenders.[17]  The testimony also shows that Keeton drafted another medical form (a Sick Call Request) for Grayson that afternoon; that Grayson again saw medical staff; and that medical staff, including two doctors, discussed Grayson's medication requests and decided that no change was necessary given the medication Grayson was already taking.

Keeton largely does not deny the above facts, claiming ignorance of what Grayson told medical staff.  She does not contest that Grayson told medical staff that his attorney had instructed him to ask for Midazolam.  Nor does she contest that Grayson in fact was seen by Nurse Andrews and Dr. Edmonds.  And she

---

[17] The Federal Defenders argue the Court should only consider the statements in the emergency motion itself and should ignore Keeton's interactions with Grayson, Keeton's note, and Grayson's statements to the medical providers, all because they are extraneous.  The Court rejects this proposition, as the actions and communications between Grayson, Keeton, and the medical providers played a key role in the basis for the emergency motion's filing, the statements contained in it, the omissions from it, and the motivations of legal counsel.

acknowledges that she drafted the handwritten note that Grayson showed Nurse Andrews and Dr. Edmonds. She denies, however, that it specifically requested Midazolam. She also denies that she told Grayson to ask medical staff for Midazolam.

As to what Grayson told Keeton about the telehealth visit, Keeton largely places blame with Grayson, saying that as an attorney, she acted reasonably in relying upon what Grayson told his attorneys about the telehealth visit. This position assumes that Grayson told her virtually nothing about the visit, lied about it, or left out key parts.

It is Keeton's word against the two medical providers as to what exactly was said to and by Grayson. And unfortunately, Grayson is not present to testify about what was said to him, what he told the medical providers, or what he and Keeton discussed. But there is credibility to the medical providers' testimony about Midazolam, given that Keeton acknowledges having written the word Midazolam on the note that Grayson gave to the medical providers. And Keeton's testimony is vague about what Grayson told her about the visit, other than that Grayson told her that the medical provider said it was "too late." While the Court recognizes that Keeton was not actually present at the telehealth visit and therefore does not know first-hand what was discussed, the surrounding circumstances cast doubt on what the Federal Defendants claim actually happened.

As to Hahn, he generally does not dispute what Grayson told or showed the medical providers, or that Keeton told him that Grayson was crying, yelling and begging and had instructed them to file an emergency motion. Calling it an "innocent" error and negligence, Hahn responds that he made the statement in the emergency motion about Grayson not receiving a medical assessment because he believed the telehealth visit, even to address a psychiatric or mental health issue, did not constitute such an assessment. In his opinion, Grayson should have had his blood

pressure checked in order to have received a proper medical assessment in response to Grayson's medical request for a sedative. Thus, what Grayson did receive from Dr. Edmonds—their communications during the telehealth visit—did not rise to the level of a medical assessment for purposes of medical staff properly considering his request. In other words, according to Hahn, Grayson may have had a psychiatric assessment, but he did not have a medical one and because he did not have a medical one, then his requests for a sedative to address his claimed increasing anxiety were not considered.

This of course has problems too. For example, Hahn's position acknowledges that Grayson received a psychiatric assessment by medical staff (Dr. Edmonds) and that Hahn was aware of it. And Hahn acknowledges that the prescription of a sedative and anxiolytic falls within the expertise of a psychiatrist. Yet Hahn did not disclose this fact in his emergency motion, thereby leading to the misleading nature of the pleading and the relief sought. Instead, the motion represented that Grayson sought out medical care for a sedative because of his psychiatric-related condition and that there was no assessment made by the appropriate medical provider for that request. That was incorrect. In truth, Grayson, at Keeton's urging, claimed he needed a telehealth appointment with the prison doctor, Grayson participated in that telehealth visit with a prison doctor, and Keeton and the Federal Defenders certainly were aware and knew that he participated in it.

There is another troubling observation about the basis for filing the emergency motion. Within three minutes of receiving defense counsel's email on November 21 that contained the nurse's summary and that demanded Hahn withdraw the motion, Hahn withdrew the emergency motion. Hahn did not consult Grayson before he did it. Nor did anyone with the Federal Defenders. One would think that if, on November 20, Grayson was "crying," "yelling," and "begging" for a sedative and suffering from "several anxiety" and "claustrophobia" so much so that he instructed

the Federal Defenders to file the emergency motion on his behalf, then the Federal Defenders would at least attempt to consult him before they withdrew it. They did not. Instead, they withdrew the motion within minutes, and before they were questioned by the Court about their motion. This suggests the emergency motion was attorney-driven, not client-driven.

But that is not all. In his motion to withdraw the emergency motion, Hahn wrote that the Federal Defenders were withdrawing the motion because there were "factual disputes," and Grayson's attorneys thought it was best that they devote the last hours in the day to visiting with Grayson rather than litigating his emergency request. This is inconsistent with the exigencies stated in the emergency motion and the commonsense fact that any attorney filing a motion, especially an emergency one, would know that it is very likely he or she would be called upon to argue the motion before the court. As such, the stated grounds for withdrawing the motion raise their own suspicions.

The Federal Defenders last make a Hail Mary pass and argue that they should not be sanctioned because Dr. Edmonds did in fact alter Grayson's Xanax prescription the day of the execution. From this after-the-fact discovery, they argue their emergency motion was not frivolous; it was successful because it brought about the very relief that Grayson was seeking. The problem with this position is two-fold. First, the change occurred well after the emergency motion was withdrawn. Second, their emergency motion sought a sedative—the same sedative they were pushing for in their preliminary injunction motion as part of an alternative execution protocol—*in addition to* the Xanax that Grayson already was taking. And this change of course could only have come after a medical assessment with a prescribing physician at Holman, which again, was a medical assessment that the emergency motion represented had not been performed.

All told, the Court finds the Federal Defenders' after-the-fact narrative

suspect.  The record suggests that Grayson's medical visit in the claimed pursuit of a sedative (Midazolam) and the resulting emergency motion about the lack of a medical assessment was manufactured by the Federal Defenders for ulterior reasons, and not because of the sincere therapeutic need by Grayson or because of improper conduct by ADOC staff at Holman Correctional Facility.

Unfortunately, two key pieces of evidence are missing that would aid the Court in fully investigating and assessing the circumstances presented to it via the Defendants' sanctions motion — the note and testimony from Grayson.  Without that evidence, the Court cannot say that the Federal Defenders' conduct (particularly, Keeton and Hahn), rises to the level of being vexatious and tantamount to bad faith. Had that evidence been presented and had it confirmed the Defendants' assertions of misconduct, the Court's conclusion very likely would be different.  That said, based on the current record, the Court concludes the filing of the emergency motion, and the factual premise made in it, was indeed reckless but not so egregious as to be tantamount to bad faith as required under § 1927.

And even if the Court were to conclude that bad faith exists, that itself is not enough under § 1927 for a sanctions finding.  Section 1927 also requires that the attorney's conduct multiply the proceedings.  Here, the Federal Defenders filed an emergency motion at 6:58 p.m. on November 20, notified counsel for the Defendants that they were withdrawing the motion at 9:40 a.m. on November 21, and then withdrew the emergency motion at 10:16 a.m., a period of about fourteen hours.  The Court acknowledges that the Federal Defenders promptly withdrew the motion before the Court held a hearing and after the Defendants made their withdrawal demand.  Under these unique facts, the Court concludes that the Federal Defenders did not sufficiently multiply the proceedings for purposes of sanctions under §1927 when they filed the emergency motion.  *See Peer*, 606 F.3d at 1314; *Michel v. United States*, 112 F. App'x 252, 255–56 (4th Cir. 2004) ("[W]e conclude that the filing of

29

a single motion by Michel, which necessitated only a routine response, did not so 'multiply the proceedings' as to violate section 1927."); *see also Boler v. Space Gateway Support Co. LLC*, 290 F. Supp. 2d 1272, 1285 (M.D. Fla. 2003); *Reef Azul, LLC v. Potter*, No. 22-80815, 2022 WL 17583747 (S.D. Fla. Aug. 22, 2022), *report and recommendation adopted*, No. 22-CV-80815, 2022 WL 17583750 (S.D. Fla. Sept. 8, 2022) (denying § 1927 sanctions where the offending pleading was pending for only eleven days and voluntarily withdrawn). After all, if the Defendants' sanctions motion came by way of Rule 11, sanctions would not be awarded because of the safe harbor provision. Fed. R. Civ. P. 11(c)(2); *see also Peer*, 606 F.3d at 1315 ("The purpose of Rule 11(c)(2)'s safe harbor provision is to allow an attorney who violates Rule 11 to correct the alleged violation within twenty-one days without being subject to sanctions."). Simply put, the Court finds it significant that the Federal Defenders acted promptly when asked to withdraw the motion. As a result, the Court cannot conclude that Hahn and Keeton have multiplied the proceedings unreasonably and vexatiously within the meaning of 28 U.S.C. § 1927.

Finally, under §1927, sanctions are intended to cover "excess costs, expenses, and attorneys' fees reasonably incurred" because of such conduct. Here, there has been no evidence provided of "excess costs, expenses, and attorneys' fees" that have been "reasonably incurred." 28 U.S.C. § 1927. The Defendants were, and are, represented by the Attorney General's Office, not outside attorneys. As such, there have been no *incurred* attorneys' fees.

The Defendants argue that nevertheless there were approximately eleven hours of attorney time devoted to investigating the Federal Defenders' emergency motion, and that should count for something. True. And the Court also devoted time that evening and the next morning to this ill-filed emergency motion as well. But the statute refers to "excess costs, expenses and attorneys' fees" with the additional requirement that they be "incurred." No such incurred excess fees exist.

Looking to Rule 11 and its general provision for an award of "reasonable fees," as the Defendants suggest, is unhelpful, as the current motion proceeds under the more limiting language of § 1927.

### C.    Spiritual Advisor Issue

Although not explicitly made the basis of the Defendants' sanctions motion, the Court finds it necessary to address another concern as it relates to the conduct of the attorneys here since it does bear on the issue of the attorneys' motives in filing the emergency motion. And that is, spiritual advisors.

Until 2021, no one was allowed in the execution chamber except for ADOC representatives. That changed in 2021 with litigation filed in the Middle District of Alabama. Since then, spiritual advisors have been permitted in the execution chamber itself; attorneys however have not been permitted. And understandingly so. That changed here with the actions of the same attorneys involved in filing the emergency motion. And the timeline of events suggests a possible misuse of the spiritual advisor process in an effort to put an attorney in the chamber.

After the Court commented upon the gamesmanship[18] at play in this litigation, Keeton filed an affidavit stating that between the date that the Alabama Supreme Court authorized Grayson's execution (August 12, 2024) and the date that Governor Ivey set it (August 19, 2024), Grayson asked Keeton to serve as his spiritual advisor (doc. 120-1 at 2; doc. 136-1 at 3) which, according to Keeton, came as no real surprise since she and Grayson had often talked about their spiritual faith and had prayed together  (doc. 120-1 at 2).

---

[18] The Court also mentioned gamesmanship from the Attorney General's Office in having attorneys serve as witnesses to the use and effect of the mask and in calling as a witness at the preliminary injunction hearing an attorney from its office who viewed the Smith execution after previously opposing the Federal Defenders' motion to videorecord the Smith execution.

Keeton's affidavit testimony however contradicts the August 19, 2024, letter that she sent to ADOC's general counsel. In that letter, which she authored *after* having allegedly spoken with Grayson about serving as Grayson's spiritual advisor, Keeton wrote that Grayson would like to have his attorney present "in lieu of a spiritual advisor." (Doc. 136-1 at 9.) In that same letter, when wanting to be present as an attorney for Grayson, Keeton also asked permission to have a watch, pen, paper and activated cell phone. The inference being that Keeton's intent was more about documenting the execution for future litigation than in honoring the final requests of a condemned inmate. Then, when informed by ADOC general counsel that Grayson could not have his attorney present in lieu of a spiritual advisor, Keeton switched tactics, authoring a letter on August 29, 2024, that notified ADOC that Grayson was designating her as his "designated spiritual advisor" and Matt Schultz, another attorney with the Federal Defenders' office, as the "designated alternate." (Doc. 84-24 at 1–2.)

This timeline and the statements in the written correspondence call into doubt the true intentions of the Federal Defenders' office and suggests the possible misuse of the spiritual advisor process. While ADOC has not made a formal protest or filed a motion over it in the context of Grayson's litigation, the series of events do create a concern that the attorneys here are not operating in conformity with the expectations of professionalism and candor that is expected of all attorneys. And, arguably, it could constitute circumstantial evidence of the bad faith motivations that the Defendants say underlie the filing of the emergency motion in the first place. The Court will go no further than mention this troubling observation about counsel's conduct.

## CONCLUSION

The Court will deny the Defendants' *Motion for Attorney's Fees*. But the Federal Defenders do not get off *scot-free*. The conduct here is troubling. Putting

aside the spiritual advisor concerns, the emergency motion was another example of the gamesmanship that is regularly occurring in these cases. And it must stop. The Court recognizes that death penalty litigation is highly emotional, and the stakes are probably at the highest. And here, one of those stakes is "the cause," with "the cause" being to stop Nitrogen Hypoxia or at least slow or stall it before it spreads to other states. This case presents a rare circumstance where counsel's zealous advocacy for "the cause" diverted from the interests and requests of the client. After all, the record is clear that Grayson did not want Midazolam; he testified under oath to it. And as such, the Federal Defenders were aware of it. Yet the Federal Defenders tried to push it and arguably tried to push it under the guise of a therapeutic need for a sedative.

Simply put, the judgment exercised in filing the emergency motion on the basis and for the reasons that it was filed was reckless. But the Court does not perceive that counsel's conduct was so egregious, rose so high, as to be sanctionable bad faith under § 1927 when the existing record and all factors under § 1927 are considered. At worst, these proceedings demonstrate lawyering that fails to meet idealistic standards. The Court therefore will not sanction the Federal Defenders under § 1927 over this. The Court's discussion of the events should be enough.

Accordingly, the *Defendants' Motion for Attorneys' Fees* (doc. 114) is **DENIED**.

DONE, on this the 29th day of August 2025.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE